UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | | |
|---|---|---|
| Adeline Yon, | ) | C/A No. 5:14-2098-JMC-KDW |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| The Regional Medical Center, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff Adeline Yon ("Plaintiff" or "Yon") filed this action against her former employer, Defendant The Regional Medical Center ("Defendant" or "RMC"), alleging racial discrimination, retaliation, and harassment in violation of Title VII of the Civil Rights Act of 1964, as amended. She also brought against Defendant state-law-based claims for breach of contract and breach of contract accompanied by a fraudulent act. Compl., ECF No. 1. At the close of discovery, Defendant moved for summary judgment. ECF Nos. 36. Plaintiff responded to this motion, ECF No. 38; Defendant filed a reply, ECF No. 42, and a supplement, ECF No. 48. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a report and recommendation ("Report") regarding Defendants' pending dispositive motion. Having reviewed the parties' submissions and the applicable law, the undersigned recommends Defendant's Motion, ECF No. 36, be *granted* and this matter be ended.

I.      Factual Background[1]

    A.      RMC Home Care

RMC is a full service hospital in Orangeburg, South Carolina. Plaintiff worked for RMC's Home Care practice ("HC") as a medical social worker ("MSW") from May 3, 1999 through January 29, 2013. For a portion of this time, she went by the last name "Chukwuka." *See* ex. 1 to Pl's Dep. (Employment Application), ECF No. 36-10; Affidavit of HC Director David Hill ¶¶ 1, 7 ("Hill Aff."); ECF No. 36-2. HC provides in-home healthcare services for certain patients. The purpose of HC is to increase the convenience and reduce the cost of health care by delivering certain types of health care in the patient's home. HC is located near RMC in a small retail office complex. Hill Aff. ¶¶ 1, 7.

David Hill began working as HC Director in November 2012. He reports to Julia Yawn, RMC's Vice-President of Patient Services. The primary workforce of HC consists of "clinical" staff, which includes registered nurses, therapists, and a social worker. Clinical staff members perform a wide variety of services, including providing medical, therapeutic, and social work services that patients may need. Hill Aff. ¶¶ 3, 4.[2] HC's clinical staff is supervised by a Patient Care Coordinator, who schedules appointments for the nurses, therapists, and social workers. *Id.* ¶ 3. Wendy Dantzler was the Patient Care Coordinator from 2006 until July 2012. Jill Hopkins began working as Patient Care Coordinator on October 1, 2012. *Id.*

Patients are generally referred to HC by physicians or hospitals. The referral includes a diagnosis and a request that HC set up a treatment plan and provide appropriate services to the patient. An admissions nurse visits the patient's home, performs an initial assessment, and develops that

_____

[1] As it must, the court considers the facts in the light most favorable to Plaintiff, the nonmoving party. These facts are derived from Defendant's Motion and Plaintiff's Response thereto. To the extent necessary, additional facts are set out in relevant portions of this Report.

[2] Plaintiff references HC's job description for a social worker. *See, e.g.*, Pl.'s Mem. 2. Details of the job description are discussed within to the extent they are relevant to issues before the court.

patient's treatment plan. The treatment plan may or may not involve other clinical staff members, such as physical therapists, occupational therapists, speech therapists, or social workers. Hill Aff. ¶ 5.

Hill indicates that members of the clinical staff may report to the HC office briefly in the morning and again in the afternoon to check in and complete paperwork. Most of the workday is spent "'in the field'" visiting patients and rendering services in compliance with the established treatment plan. Hill Aff. ¶ 6. Clinical staff members are required to fill out a "Daily Report," which includes the staff member's activities and records the time spent performing each of those activities. If the activities included travel, "they should be accompanied by a description of the destination and the mileage driven." *Id.*[3] At times relevant to this litigation, clinical staff traveled in their personal vehicles and were reimbursed 50.5 cents per mile for mileage incurred as a result of HC services provided to HC patients. As mileage was an expense reimbursement, it was not taxable to clinical staff. *Id.*

B.     Plaintiff's employment at and termination from RMC[4]

While working for RMC's HC group from May 3, 1999 through January 29, 2013, Plaintiff was the only social worker on the HC clinical staff. As explained by Plaintiff in her deposition, social work services are requested in the treatment plans of some, but not all, HC patients. When sought, social work services are intended to help improve the home environment and connect patients to non-medical community resources that may be helpful to the overall treatment plan. Pl's Dep. 25, 29-30, ECF No. 38-8 (full transcript of Pl.'s Dep.). It is undisputed that, during her employment with RMC,

---

[3] Plaintiff points out HC's job description for a social worker did not specify how the employee was to calculate mileage for purposes of seeking reimbursement. Pl.'s Mem. 2. Defendant does not dispute this point.

[4] Plaintiff has presented evidence of several events that allegedly took place during her RMC employment in support of her claims, most of which she submits as evidence of a purported hostile work environment and retaliation. Such evidence is discussed below in analyzing Plaintiff's Title VII claims. Regardless of whether set out in the "Factual Background" or "Analysis" sections of this Report, the undersigned has considered all competent evidence in making its recommendations.

Plaintiff was the only HC social worker. She was a salaried employee during all times relevant to this lawsuit. Pl's Dep. 107-08.

In December 2012, Julia Yawn, Director of Patient Services, and CFO Cheryl Mason advised Hill he should look for ways to cut expenses. In considering how to reduce expenses, Hill's options included mileage, office supplies, and cell phone usage. In a prior position with a health care operation in Tennessee, one of the ways Hill had managed and reduced expenses was to audit the mileage of clinical staff by comparing the reported mileage between the locations to MapQuest. Hill Aff. ¶ 9.

On January 8, 2013, Hill discovered Plaintiff had assisted a patient in moving to a different home on a Sunday. Hill expressed concern because such actions were outside of the scope of her employment and could have created liability for RMC. Although Plaintiff advised Hill she was assisting with the move on her own time, Hill later learned Plaintiff sought compensation for that time and had completed a time sheet including one hour of office time and five hours of HC visit time for that work. Hill verbally counseled Plaintiff on the issue. Hill Aff. ¶¶ 2-3.

Hill held staff meetings at least once a month to share and disseminate information. On or about January 24, 2013, Hill distributed a meeting agenda and conducted a staff meeting at HC. Plaintiff secretly taped the meeting, which included a discussion of financial matters. One item Hill discussed was a $400,000 "write-off" from the HC budget. This amount had been written-off by the hospital because it represented uncollected bad debts and disallowed charges to providers. These charges had accumulated for several years and the hospital felt that they needed to be written-off. According to Hill, the $400,000 write-off was not a major part of the meeting; everyone in the meeting except Plaintiff understood the concept of a "write off." Although explained to Plaintiff several times, she continued to believe that someone had embezzled or stolen $400,000. Hill Aff. ¶ 8. *See* Jan. 24,

2013 Meeting Agenda (attachment 1 to Hill Aff.), ECF No. 36-2 at 10; Tr. of Jan. 24, 2013 Meeting

(attachment 2 to Hill Aff.), ECF No. 36-2 at 11-66.

A portion of the conversation between Hill and Plaintiff concerning the need to control

expenses and the mileage audit follows:

> Yon: But is it true? I heard that we're short $400,000 ---
> Hill: $485,000 last year.
> Yon: That is – but what are you all doing to try to find out where the money is or what's happening?
> Hill: Well, a lot of it – apparently, last year, last summer, the hospital – apparently they had not been writing this money off, this contractual allowances and bad debt. Well, they did it all at once and it was – it was nearly $200,000. And so that went against our bottom line. But I'm saying that and also saying that we lost $485,000 so there's a lot of difference in addition to that. And that's why we're examining the *mileage, the phones, the number of visits, everything to see – and trying to centralize the medical supplies*. Because we're just trying to figure out exactly where all this money's going because I don't think we're overstaffed.

ECF No. 36-2 at 33.

In mid-January 2013, Hill began the process of checking employee mileage using MapQuest as

a tool to gauge the accuracy of the mileage reported.[5] Administrative Assistant Eryn Radewitz assisted

him with this project and initially selected several clinical staff members for the initial review. Hill

personally reviewed all of Radewitz' work, including routes and calculations. Hill notes the mileage

figures turned in for reimbursement and the mileage MapQuest indicated between two points would

not always be an exact match. Hill indicates he had learned from past experience, though, that

MapQuest "was an accurate way to audit mileage if minor variations were ignored." Hill Aff. ¶ 10.

The review's results indicated a "pattern of falsification" by Plaintiff. Hill Aff. ¶ 11. Radewitz

began the audit with the most recent two-week pay period for which she had records. In the initial two-

---

[5] The audit's findings are relevant to Plaintiff's termination and are set forth in this factual summary for background. Plaintiff raises various challenges to the legitimacy of the methodology HC used to conduct the mileage audit. She also offers some reasons for the discrepancies. Those challenges are discussed within.

week pay period audited, the results indicated Plaintiff had claimed 174 extra miles, which totaled an additional $90 of mileage reimbursement. During that period, the audit indicated Plaintiff had sought reimbursement for 332 miles traveled, but MapQuest indicated that her mileage should have been approximately 170 miles. *Id. See* Hill Aff. ¶ 12 and attach. 3 to Hill Aff. for details and back-up documentation concerning the audit of Plaintiff's submitted mileage, which includes documents audited in considering Plaintiff's post-termination grievance).

As Hill explained, the audit indicated trivial differences in mileage reimbursement sought by other employees. He noted those amounts were minor and sometimes over and sometimes under the MapQuest figure. Hill's audit indicated Plaintiff's mileage requests were consistently over the MapQuest figures by significant amounts. *See* Hill Aff. ¶ 10-11; Hill Dep. 43, ECF No. 36-8.

On January 29, 2013, Hill asked Plaintiff about her mileage discrepancies. Plaintiff responded that she was a social worker and had to drive long distances. Plaintiff declined to discuss any specific mileage charges with Hill. Hill Aff. ¶13.[6] According to Hill, Plaintiff returned to Hill's office shortly afterward and "became loud and abusive." *Id.* Hill indicated Plaintiff suggested to Hill that he "must not have enough to do" if he had time to check her mileage. *Id.*[7]

Hill then met with Kim Westbury, Director of Human Resources ("HR") and recommended Plaintiff's employment be terminated for falsifying mileage unless she was able to explain the discrepancies. Hill obtained approval from Howard Harris, HR Vice-President and Yawn to further meet with Plaintiff to discuss the situation. Hill Aff. ¶ 14.

---

[6] In her deposition, Plaintiff indicated Hill did not ask to meet with her at that time; rather, he "got in [her] face and yelled in [her] face." Pl.'s Dep. 74.

[7] Plaintiff testified she did not go to Hill's office to meet with him at that time. Pl.'s Dep. 74. Plaintiff said she was "in a state of shock" when Hill confronted her, and she did not say anything but went out to see her patients. *Id.* This factual discrepancy is not relevant to the recommendation herein.

Later on January 29, 2013, Hill, Westbury, and Plaintiff met at RMC's HR office. Hill Aff. ¶ 15. Hill began to explain the differences between Plaintiff's reported mileage and the audit conducted using MapQuest. Plaintiff took the documents from Hill and placed them in the middle of the table. She claimed she was being "singled out." *Id.*, *see also* Pl's Dep. 76. Westbury told her that all employee mileage was being reviewed, not just hers. According to Hill, Plaintiff continued to interrupt the meeting and became loud and disruptive. Hill Aff. ¶ 16. At some point during that meeting, Plaintiff said, "If you are going to fire me, then fire me." Hill Aff. ¶ 16. Plaintiff stood up, held her hands over her head, and said, "Thank the Lord, I am free." She then hugged Hill and Westbury, opened the door, and left. *Id.*; Westbury Aff. ¶¶ 6-8, ECF No. 36-5; Pl's Dep. 76-77. The substance of the mileage entries and audit were not discussed.

C.      Plaintiff's internal grievance and resulting investigation

On January 30, 2013, Plaintiff filed a grievance with RMC. Grievance, ECF No. 36-14. Under RMC's Grievance Procedure, any employee can file a grievance regarding various issues—including termination. Pursuant to RMC policy, a grievance is first heard by the vice-president over the particular area, who, in this case, would have been Julia Yawn. It is next considered by the Chief Executive Officer of RMC, who, in this case, would have been Thomas C. Dandridge. Dandridge Dep. 5, ECF No. 36-7. The decision regarding termination of Yon's employment could have been reversed by either Yawn or Dandridge. *See* Grievance Procedure, attachment 9 to Harris Aff., ECF No. 36-4 at 85-87.

In investigating Plaintiff's grievance, Yawn requested further audits of Plaintiff's mileage. As a result, at Hill's request, Radewitz further audited Plaintiff's mileage and found additional evidence of Plaintiff's continuously overstating mileage. *See* Hill Aff. ¶ 18. In reviewing records from November and December of 2012 and the yet-to-be-checked records of January 2013, Defendant discovered

additional discrepancies, which resulted in Plaintiff's claiming 552 additional miles. *Id.; see also* Def.'s Mem. 11 (including chart of alleged discrepancies).

During the investigation concerning Plaintiff's grievance, Yawn asked Hill to review Plaintiff's personnel file to see whether it contained other items that potentially could impact consideration of Plaintiff's grievance. Hill Aff. ¶ 17. In his review, Hill found a letter dated May 27, 1999 from the South Carolina Board of Social Work Examiners ("the SWE Board") referring to a complaint that had been filed against Plaintiff earlier in 1999. *Id.*; May 27, 1999 Ltr., ECF No. 36-2 at 120.[8] Although the letter was issued after Hill had begun working with RMC on May 3, 1999, the complaint had been filed when she still worked for the South Carolina Department of Health and Environmental Control ("DHEC").[9] The SWE Board dismissed the complaint for lack of evidence to support "a violation of the practice act," ECF No. 36-2 at 120. The SWE Board did issue its "Letter of Warning," in which it noted "concerns regarding the inaccuracy of [her] documents used in billing for mileage." *Id.* The SWE Board "strongly recommend[ed]" that Plaintiff "evaluate any similar circumstances to ensure this does not happen again." *Id.*

Plaintiff met with Yawn regarding her grievance on February 7, 2013.[10] Following her meeting and a review of the additional information gathered for the grievance, Yawn issued a letter to Plaintiff on February 12, 2013, confirming her termination. Plaintiff then followed the next step of RMC's

_____

[8] Plaintiff submits the 1999 investigation and warning are irrelevant in this matter and "do not indicate she did the actions she is accused of in this case." Pl.'s Mem. 20-21. The court agrees. Nonetheless, as it was considered by RMC in considering Plaintiff's grievance of her termination, it is appropriately noted herein for completeness.

[9] Plaintiff had worked as a medical social worker with Edisto Home Health, a DHEC agency. She resigned from that position "effective April 2, 1999, at 5:00 p.m. in a letter dated April 2, 1999. Letter, ECF No. 36-11.

[10] Although Plaintiff told Yawn she was not recording that February 7, 2013 meeting, she did secretly record it. *See* Pl.'s Dep. 81; Tr. of Feb. 7, 2013 Meeting, ECF No. 26-17.

grievance procedure and met with President and CEO Dandridge on March 19, 2013. After reviewing the files and the information provided, Dandridge upheld the termination.[11]

      D.     Defendant's February 11, 2013 report to SWE Board

On February 11, 2013, after the review of additional mileage reports and the previous letter from the Board of Social Work, Yawn filed a complaint with the SWE Board regarding Plaintiff's mileage misrepresentation. The complaint was investigated by Cheryl McNair, an Investigator with the South Carolina Department of Labor, Licensing & Regulation ("LLR"), who reviewed Plaintiff's mileage reports from August 1, 2012 through January 24, 2013, and reported that Plaintiff had submitted requests for reimbursement for traveling 4,258.12 miles, while MapQuest reports for the same routes Plaintiff indicated she had traveled showed a total of 2,396.6 miles—a difference of approximately 1,861.54 miles. *See* SWE Board Order regarding Defendant's complaint ¶ 5, ECF No. 36-15.

The SWE Board conducted a hearing on Defendant's complaint against Plaintiff on September 16, 2013, and found the State met its burden of establishing Plaintiff violated S.C. Code § 40-63-11(B)(11) and (15) "regarding intentionally using false statements in any document connected with the practice of social work by engaging in unprofessional conduct. This is based upon Respondent's submission of inaccurate mileage documents to her employer." ECF No. 36-15 at 4. The SWE Board found the State had not established a violation of other code sections because "while the documents submitted contained false statements, the Board does not find that the statements were fraudulent, as although the mileage was inaccurately reported, [Plaintiff's] intent was not to defraud RMC." *Id.* Plaintiff received a Public Reprimand and was required to take a record-keeping course or face suspension of her license. *Id*. Plaintiff is still a licensed social worker. Pl.'s Mem. 21.

---

[11] Facts subsequent to February 11, 2012 are taken from Defendant's Memorandum, which included no citations to the record. Plaintiff has not questioned these facts.

E.       Plaintiff's replacements

After Plaintiff was terminated, RMC replaced her position with Loretta Green a part-time social worker who was called in on an as-needed basis. Loretta Green is an African-American female. Green held the position for several months. Upon Green's departure, Cathy Thompson, who is also an African-American female, took over the vacant position. *See* Hill Dep. 60, ECF No. 36-8.

F.       Miscellaneous

Plaintiff's workspace was moved in 2012 from a small office to a workspace with other clinical staff. Newly hired Data Entry Clerk Tracy Stillinger was placed into the small office formerly occupied by Plaintiff. Dantzler Aff. ¶ 18, ECF No. 36-6. Plaintiff claims the change was retaliatory.

Plaintiff indicates her assignments to patients requiring social-work referrals were reduced from 15-20 visits per week to 4-5 visits per week. *See* Def.'s Mem. 6.[12] The timeframe for this reduction is unclear. Plaintiff attributes this reduction to Dantzler's change of the protocol concerning how social-work referrals were made. *See* Pl.'s Dep. 99-100.

II.      Standard of Review

A.       Motions for summary judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by

---

[12] The undersigned is aware of no record evidence regarding the number of referrals Plaintiff received over time. Plaintiff does not challenge Defendant's statement in its memorandum that Plaintiff claimed the number of visits was reduced from 15-to-20 down to 4-to-5 per week.

"citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing  Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the

strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

   B.    Burden of proof in Title VII claims

   Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff does not argue she has presented any direct evidence of discrimination, *see* Pl.'s Mem. 29-30, so the court considers her claims under the burden-shifting framework. Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

   While intermediate evidentiary burdens shift back and forth, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the plaintiff. *See Reeves,* 530 U.S. at 146-47 ("The ultimate question is whether the employer intentionally

discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993)).

III.    Analysis

A.  Title VII racial discrimination claim—Termination[13]

Plaintiff alleges she was terminated because of her race. Plaintiff does not argue she has any direct evidence to support this claim, but submits she has presented sufficient evidence to survive summary judgment using the *McDonnell-Douglas* burden-shifting framework. Pl.'s Mem. 29-30. Absent direct evidence, the elements of a prima facie case of Title VII discrimination are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "The burden of establishing a prima facie case [] is not onerous." *Burdine*, 450 U.S. at 253.

Defendant acknowledges that Plaintiff is the member of a protected class and that she suffered an adverse action upon being discharged.[14] Defendant submits Plaintiff cannot establish the second and

---

[13] The applicable heading in Plaintiff's Memorandum states, "The Plaintiff was subjected to a racially hostile work environment, and she was pretextually wrongfully terminated." Pl.'s Mem. 29. However, Plaintiff's claim of a hostile work environment is discussed separately in Plaintiff's Memorandum, as it will be in this Report.

[14] Plaintiff's discussion of her racial *discrimination* claim focuses on her allegedly wrongful termination. *See* Pl.'s Mem. 29 (discussing prima facie case of discriminatory discharge). To the extent Plaintiff's claims regarding her changed workspace, reduced workload, and reduced supervisory authority are considered in this context, these claims do not amount to "adverse employment actions," nor do they otherwise salvage her racial discrimination claim. *See, e.g., Richardson v. Richland Cnty. Sch. Dist. No. One*, 52 F. App'x 615, 616 (4th Cir. 2002) (finding teacher's assignment to undesirable classroom not adverse employment action); *see Rock v. McHugh*, 819 F. Supp. 2d 456, 470 (D. Md. 2011) (finding no adverse employment action in Rehabilitation Act context based on plaintiff's move from three-window office to shared cubicle not materially adverse); *Murray v. City of Winston-Salem, N.C.*, 203 F. Supp. 2d 493, 502 (M.D.N.C. 2002) ("[R]elocating [plaintiff in Title VII retaliation

fourth elements of her prima facie discrimination claim. Regarding the second element—satisfactory job performance—Defendant argues Plaintiff's falsification of records prevents her from demonstrating she was meeting RMC's legitimate expectations. Def.'s Mem. 17-18 (citing cases in support).

In response, Plaintiff argues she was "qualified for her job" based on her approximately 14-year work history at RMC and her being a licensed social worker in good standing. Pl.'s Mem. 29. Further, Plaintiff argues that "contrary to Defendant's argument" she was satisfactorily performing her duties at the time of her discharge. *Id.* In support, Plaintiff indicates she "always had positive job performance evaluations, until she was wrongfully terminated, and Defendant attempted to justify her termination by giving her a negative job performance review[.]" *Id.* at 29-30. Plaintiff argues a jury question exists as to whether she was performing her job satisfactorily. She acknowledges her poor review upon her termination, but submits other evidence disagrees "with the Defendant's opinion that Plaintiff did not perform her job duties satisfactorily." *Id.* at 30 (referencing Plaintiff's prior positive performance reviews, the last of which was given in 2011; the testimony of her "colleagues['] (who worked closely with her) observation of Plaintiff's job performance (as shown in the facts and Affidavits),[15] and the [opinions] of the patients (and patients' families)").

The undersigned agrees with Defendant. As an initial matter, Plaintiff's opinion of her own abilities is not relevant. Rather, as a matter of law, courts consistently find it to be the employer's perception of job performance, and not the employee's, that is controlling. *See Holland v. Wash. Homes Inc.,* 487 F.3d 208 (4th Cir. 2007) (finding a court's focus is on the perception of the decision-maker, that is, whether the employer believed its stated reason was credible); *see also, Hawkins v.*

---

claim]'s work space from a private office to a cubicle is not sufficient to constitute an adverse employment action.").

[15] Plaintiff does not provide specific reference to the evidence from others she claims supports her argument that she was performing satisfactorily.

*PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (disregarding the plaintiff's opinions of her own performance because "[i]t is the perception of the decision-maker which is relevant, not the self-assessment of the plaintiff"); *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (noting opinion of plaintiff's co-workers as to the quality of plaintiff's work not to be probative). Any opinions of Plaintiff's patients or their families would be similarly unhelpful to Plaintiff. Plaintiff's evidence of her job performance is insufficient. *See also Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, No. 15-1090, 2015 WL 6389167, at *2 (4th Cir. Oct. 22, 2015) (affirming grant of summary judgment for defendant when plaintiff had not established prima facie case, noting at the prima facie stage the court is to consider the employer's "'evidence that the employee was not meeting [the employer's legitimate subjective employment expectations] expectations.'" (quoting *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 515–16 (4th Cir. 2006)).

Further, Plaintiff cannot satisfy this element of her prima facie case by relying on her prior satisfactory performance reviews, the last of which was from 2011. Feb. 3, 2011 Performance Review, ECF No. 38-3. The relevant time to evaluate an employee's performance is at the time of the adverse action—here, her January 29, 2013 termination. *Miles v. Dell, Inc.,* 429 F.3d 480, 485 (4th Cir. 2005). Her 2011 performance evaluation does not provide sufficient evidence to create a genuine issue of fact that she was meeting her employer's legitimate expectations in January of 2013.

In making this recommendation, the undersigned notes that Plaintiff questions the methodology used in the mileage audit and that Plaintiff does not concede that she falsified her mileage reports. *See, e.g.,* Pl.'s Mem. 17 (arguing her termination was "based on the unfounded conclusion that she had falsified her mileage when she visited patients at their homes"). Plaintiff questions Defendant's use of MapQuest to compare the mileage presented and notes the person who reviewed and compared the reports was not a "professional auditor and she did not hold a degree in any field relating to auditing."

*Id.* Plaintiff also argues that, because RMC has no "official policy and procedure on how to calculate mileage" Hill had used his own procedure in conducting the audit using MapQuest. *Id.* In challenging the MapQuest methodology, Plaintiff proffers the unsworn statement of Arnita Frazier, an RN who worked for HC. Frazier's Aug. 14, 2013 Letter/Statement, ECF No. 38-21. Frazier notes that she was not aware of a policy requiring the use of MapQuest and that she rarely used MapQuest for directions or mileage, preferring to contact the patient, obtain directions, and note the mileage on her vehicle's odometer. *Id.* Plaintiff also references the "deposition" of another HC nurse, Barbara Grant, but cites to Plaintiff's own deposition concerning Grant's testimony. Pl.'s Mem. 18 (noting Grant had indicated she sometimes got lost, had to call the patient, and then drive around more).

Even if appropriate to consider this "evidence," it does nothing to bolster Plaintiff's argument regarding her own job performance. Rather, Plaintiff's argument that RMC had no precise policy of how to record and seek mileage reimbursement and her challenge to the audit's results as to her, at bottom, do no more than set forth her own opinion that she was performing up to expectations at the time she was terminated. As noted above, that is insufficient. *See King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir. 2003) (noting plaintiff's own testimony of satisfactory job performance cannot establish a genuine issue as to whether she was meeting employer's expectations in a race discrimination case); *Howard v. Coca Cola Bottling Co. Consol.*, No. 4:12-CV-2647-RBH, 2014 WL 897334, at *14 (D.S.C. Mar. 6, 2014) (considering plaintiff's testimony that she did not falsify time records as her opinion she was performing satisfactorily but noting such as insufficient to demonstrate prima facie element of satisfactory job performance).

Considering all evidence in the light most favorable to Plaintiff, Plaintiff has not carried her burden of proving a prima facie case because she has not shown she was meeting Defendant's legitimate expectations at the time of termination. The undersigned is of the opinion that no reasonable

jury could find Plaintiff was meeting expectations at the time she was terminated. Plaintiff's Title VII race discrimination claim should be dismissed.

Even assuming, *arguendo*, that Plaintiff could satisfy the second element, the undersigned agrees with Defendant's argument that Plaintiff cannot satisfy the fourth element of her prima facie case—that she was treated differently than others outside of her protected class who were similarly situated. Defendant points out that Plaintiff was replaced by another African-American female, making her unable to show this prong of the prima facie case. Plaintiff does not refer to that argument, but submits others outside of Plaintiff's protected class (race) "were treated more favorably under apparently similar circumstances." Pl.'s Mem. 30. Plaintiff proffers as comparators others whom the MapQuest-based mileage audit also found to have been "excessive in their mileage" reports, but were not terminated, written up, warned, and were not reported to any professional board. *Id.* As support for this argument, Plaintiff cites to pages 14 and 15 of CEO Dandridge's deposition. *Id.* (citing Danridge Dep. 14-15). Plaintiff has not proffered any specific evidence as to who those other employees were or the circumstances surrounding their mileage audits.

Having reviewed the portion of Dandridge's deposition cited by Plaintiff, the undersigned notes that Plaintiff's argument overstates what Dandridge said. Rather, the cited portion of Dandridge's testimony provides:

> Q: Okay. When they looked at other people's mileage logs, did they find that those persons also had discrepancies in their mileage?
> A: My understanding I think they may have, but they were very minor compared to [Plaintiff's].
> Q: So the issue of being very minor versus being relatively significant as you term it, I mean who placed the value on what was significant and what was minor? Was that you?
> A: No, it was not me. I imagine again Mr. Hill probably in concert with HR. As I recall the discrepancy with [Plaintiff] was on—was on the order of twice the actual mileage.

Dandridge Dep. 14-15, ECF No. 38-18. This testimony does not even establish there were *any* employees who overstated their mileage in a manner similar to Plaintiff. Further, it does not purport to

provide information about the characteristics and performance of others who were audited. Plaintiff has not satisfied her burden of showing disparate treatment of others. *See, e.g., Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."); *Mahomes v. Potter*, 590 F. Supp. 2d 775, 783-84 (D.S.C. 2008) (examining details of plaintiff's would-be comparators and finding plaintiff had not met burden of showing prima facie case).

Based on the foregoing, the undersigned recommends a finding that Plaintiff has not set forth sufficient evidence that she was treated differently from those similarly situated but outside of her class. Further, the only evidence is that, when Plaintiff was terminated, her replacement, and her replacement's replacement, have also been African-American females.

Plaintiff has not set forth competent evidence sufficient to establish her prima facie case for racial discrimination. Accordingly, it is recommended that Defendant's motion for summary judgment be granted as to this cause of action.

Even if it were determined that Plaintiff had satisfied her prima facie case, summary judgment as to her discrimination claim remains appropriate. RMC has met its burden of producing a legitimate non-discriminatory reason for the termination: that Plaintiff was terminated based on her falsification of mileage records. *See Cooper v. Martek Biosciences Kingstree Corp.*, No. CIV.A. 4:11-2553-RBH, 2013 WL 787670, at *10 (D.S.C. Jan. 25, 2013) *report and recommendation adopted,* No. 4:11-CV-02553-RBH, 2013 WL 787669 (D.S.C. Mar. 4, 2013) *aff'd sub nom. Cooper v. DSM Nutritional Prods., LLC*, 540 F. App'x 206 (4th Cir. 2013) (noting termination for falsification of laboratory records was a legitimate non-discriminatory reason for termination) (citing *King v. Herbert J. Thomas Mem'l Hosp.* 159 F.3d 192, 198 (4th Cir. 1998)).

The burden shifts back to Plaintiff, then, to establish the reason given for her termination was merely pretextual by demonstrating by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Burdine*, 450 U.S. at 253.

As an initial matter, the undersigned notes that nowhere in Plaintiff's Memorandum does Plaintiff analyze in any depth her claim that the reason given for her termination was pretextual.[16] Rather, she focuses on arguing she has set out a prima facie case of discrimination based on her termination. Pl.'s Mem. 29-30. Nonetheless, Plaintiff's Memorandum does contain argument and proffers evidence that the real reason for her termination was based on her race (and based on retaliation). Giving Plaintiff the benefit of the doubt, the undersigned considers that evidence as having been proffered in support of Plaintiff's pretext argument.

Again, the undersigned is mindful of Plaintiff's vigorous argument that RMC incorrectly found Plaintiff was falsifying her mileage records. In so considering, the court is not to determine whether the reason RMC has given for terminating Plaintiff "was wise, fair, or even correct, ultimately, so long as it truly was the reason for [her] termination." *DeJarnette*, 133 F.3d at 299.

In arguing Defendant's reason for terminating her was incorrect, Plaintiff cites to her Grievance. In that document, she stated she never relies on internet-based maps or GPS to locate her patients, and that it is unfair for Defendant to have determined her mileage didn't "add up to the nurses because we don't see the same patients in the same order and oftentimes not from the same starting point." Grievance 1, ECF No. 38-22 (cited in Pl.'s Mem. 19-20). Plaintiff also noted that part of her work included going to various community agencies in addition to going to patients' homes. *Id.* Plaintiff submits summary judgment is inappropriate because she has set out a "genuine issue of material fact" as to whether MapQuest is a reliable method of determining mileage accuracy and

---

[16] Plaintiff states generally that the mileage audit itself was "pretext for Plaintiff's termination." Pl.'s Mem. 25.

whether Plaintiff "was wrongfully terminated from her job because she questioned the whereabouts of the missing money." Pl.'s Mem. 19-20. Elsewhere, Plaintiff submits her termination was also based on her continued complaints about the alleged racially hostile environment. Pl.'s Mem. 25.

In considering whether Plaintiff has set out sufficient evidence from which a jury could determine the proffered reason given for her termination was merely pretextual, the question for the court to consider on summary judgment is not whether the manner of Defendant's mileage audit was or was not "reliable." To do so would effectively have the court acting as a "super-personnel department[,] weighing the prudence of [the employer's] decisions." *DeJarnette*, 133 F.3d at 299 (internal quotation marks omitted). The question is not whether Defendant's decision to terminate Plaintiff was *correct*; the question is whether it was motivated by racial animus.

The undersigned is of the opinion Plaintiff has not created a genuine issue of fact to preclude summary judgment. *See, e.g.*, *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) ("Even if these investigations were improper or substandard, that does little to help [plaintiff] establish that the reasons given for her termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that her race or gender was the real reason for her termination."); *Rowe v. Goldsboro Wayne Transp. Auth.*, No. 5:13-CV-754-F, 2015 WL 3650086, at *13 (E.D.N.C. June 11, 2015) *aff'd*, No. 15-1742, 2016 WL 80878 (4th Cir. Jan. 7, 2016) (granting summary judgment and noting employee's attacks on investigation failed to create genuine issue of fact as to pretext) (citing *Estate of Bassatt v. Sch. Dist. No. 1 in the City & Cnty. of Denver*, 775 F.3d 1233, 1241 (10th Cir. 2014) ("The proper inquiry is not whether the inadequacy of the investigation foreclosed [the decision-maker] from the possibility of believing [the plaintiff]. Rather, the relevant inquiry is whether [the decision-maker] subjectively, but honestly, believed that [the plaintiff] had engaged in the misconduct.")). "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to

expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity. . . ." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) (noting such points reveal no "genuine" issue of material fact).

Further, the court notes Plaintiff was offered opportunities to go over the specific mileage reimbursement requests and MapQuest information to explain why particular the mileage requested was higher—in many cases much higher—than the mileage MapQuest indicated. This is significant in considering whether Defendant truly believed its reason for terminating Plaintiff was an appropriate one. Even now, Plaintiff only sets out blanket arguments about how her routes may have differed than routes nurses might have taken and how MapQuest is not always accurate. She has not gone through the back-up documentation and explained in detail why her mileage on a particular day might have been higher than a simple roundtrip from point *a* to point *b* might be. Plaintiff has not set forth sufficient evidence[17] by which a jury might determine the "real reason" for her termination was her race. Summary judgment is appropriate as to Plaintiff's termination claim.

The undersigned notes Plaintiff has proffered evidence of racist remarks allegedly made by her co-employee Donna McAlhany, a white female. Such evidence is discussed more fully below in considering Plaintiff's retaliation and harassment claims. Plaintiff testified that in June 2012 she overheard McAlhany tell another co-employee, Tara Livingston, that "she [McAlhany] was going to get rid of black troublemakers in the office." Pl.'s Dep. 96. On a different (unspecified) date, Plaintiff testified she overheard McAlhany telling another white employee that "blacks get too many free things such as cell phones and food stamps." *Id*. Plaintiff indicated she went in and spoke with McAlhany about that comment, telling her that was not necessarily true and that "anyone should be able to get

---

[17] As noted above, Plaintiff has not proffered specific argument as to why her *termination* was based on her race. Much of her evidence and argument focus on her hostile-work-environment (harassment) and retaliation claims, which are considered below.

assistance if they need it regardless of race, creed or color." *Id.* at 97.[18] To the extent Plaintiff relies on McAlhany's comments as evidence that her termination was motivated by race, such reliance is unpersuasive. McAlhany worked in RHC's billing department, was not part of the clinical staff, and had no supervisory role over Plaintiff. McAlhany Aff. ¶ 2. McAlhany never supervised Plaintiff, has never been asked about Plaintiff's work for purposes of any review or discipline process, and was unaware Plaintiff was being terminated until after the fact. *Id.* ¶ 6. The undersigned is of the opinion that such remarks, accepted as true for these purposes, are insufficient to create a jury question as to whether Plaintiff's termination—effected by persons with supervisory authority over her for a stated non-discriminatory reason—was actually based on her race. Further, as discussed within in greater detail, much of Plaintiff's proffered evidence that she was generally subject to racial discrimination is supported only by speculative statements of Plaintiff and several coworkers. *See Settle v. Baltimore Cnty.*, 34 F. Supp. 2d 969, 998-99 (D. Md. 1999) (plaintiff's firmly held belief that a disparate investigation was the result of discriminatory animus was not sufficient to support a federal discrimination claim). "A plaintiff is entitled to a trial on the merits of a Title VII claim if [she] . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination." *Darvishian v. Green*, 404 F. App'x 822, 828 (4th Cir. 2010). Plaintiff has not carried this burden. No reasonable jury could conclude that racial animus was a motivating factor. Summary judgment is appropriate as to Plaintiff's Title VII discrimination claim.

B. Remaining Title VII claims—retaliation and harassment

Plaintiff also brings Title VII claims for retaliation and harassment, the discussion of which is somewhat intertwined in her response to Defendant's Motion. The undersigned has considered all

---

[18] McAlhany denies having made any such statements. McAlhany Aff., ECF No. 36-3.

evidence and argument of both Plaintiff and Defendant. Following is a synopsis of much of the

evidence on which Plaintiff relies to support her claims of retaliation in regards to a supposedly

continuing hostile work environment[19] about which she "continuously complained":[20]

- Plaintiff's deposition testimony that former co-employee Charlotte Shuler told Plaintiff in October 2012 that Dantzler had instructed Shuler "to find issues" with Plaintiff's performance. Pl.'s Dep. 95.

- Deposition testimony of Plaintiff's former co-employee Grant generally recalling she and Plaintiff had been in meetings about "a lot of complaints" they had in their office, "such as discrimination with Wendy [Dantzler] doing certain things[,]" such as insulting others; Grant Dep. 15, ECF No. 38-4.

- Deposition testimony of Plaintiff's former co-employee Arnita Frazier that she had seen Dantzler's behavior around black and white employees, and it was her [Frazier's] observation "that white employees were treated with preferential treatment more so than blacks were." Frazier Dep. 23, ECF No. 38-7.

- The affidavit of Plaintiff's former co-employee Adrian McMillan offering her opinion regarding how management treated Plaintiff and other African-American employees unfairly. McMillan Aff., ECF No. 38-13; *see also* Pl.'s Dep. 120 (indicating Dantzler told Plaintiff that she [Dantzler] did not like McMillan).

- Unsworn letter from Shirley Davis, a nurse and a former co-employee of Plaintiff, who indicated she had witnessed unfairness based on race when she was employed at HMC. Davis Letter, ECF No. 38-14. She indicates she was aware of times when African Americans were unfairly terminated (including herself). She does not provide names or other specifics. She "believes" Plaintiff. *Id.*

- Deposition testimony of former co-employee LaTonya Kearse-Peeples that she had seen Plaintiff and Dantzler interact and that when Plaintiff went to Dantzler with her concerns, Dantzler "just wouldn't have anything to say. She would just look." Kearse-Peeples Dep. 40-41, ECF No. 38-9. Kearse-Peeples also testified that she believed Dantzler had discriminated against her relative to a promotion. *Id.* at 41. When asked whether she witnessed Dantzler take any discriminatory actions against Plaintiff, Kearse-Peeples responded, "Like I said, now, they would throw around racial jokes and slurs and—but I can't really remember them specifically." *Id.*

---

[19] Plaintiff has also raised a separate cause of action based on allegations of a hostile work environment, which are discussed separately herein.
[20] Not all of the evidence proffered is competent as some of the evidence is hearsay or otherwise unsubstantiated. The undersigned lists it herein for completeness.

- Affidavit from Kearse-Peeples that, while at HMC, she was passed over for a promotion for which she was qualified. "When [Kearse-Peeples] realized that [she] had been a victim of discrimination," she quit her job with HMC. Kearse-Peeples Aff., ECF No. 38-15.

- Dantzler's decision to move Plaintiff out of a small office to a workspace with the nurses. *See* Pl.'s Mem. 5-6.

- Dantzler's instruction to nurses to "cut down" the social-work case referrals they sent directly to Plaintiff; the nurses were to send the referral requests to Dantzler first. *See id.* at 9-11; Frazier Dep. 18-19, 24.

- As set out above, co-employee McAlhany's supposed racial comments overheard by Plaintiff in June 2012. Pl.'s Dep. 96-97.

### i. Retaliation claims

Title VII proscribes discrimination against an employee because, in relevant part, she "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). Employees engage in protected oppositional activity when, *inter alia*, they "complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.,* 333 F.3d 536, 543-44 (4th Cir. 2003). When, as here, direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *See Foster v. Univ. of Md.-Eastern Shore,* 787 F.3d 243, 249 (4th Cir. 2015) (confirming the *McDonnell Douglas* framework remains appropriate when Title VII retaliation plaintiff is not proceeding under direct-evidence theory). "To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove '(1) that she engaged in a protected activity,' as well as '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (*en banc*) (quoting *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405–06 (4th Cir. 2005)). If the plaintiff presents a prima facie case, the burden then shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the

plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or her claim will fail. *See Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). In the Title VII retaliation context, a plaintiff must prove retaliation was the but-for cause of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524-25. In *Foster*, the Fourth Circuit clarified that the but-for causation standard is not applied at the prima facie stage; rather, the but-for causation requirement is part of plaintiff's proof at the pretext stage. 787 F.3d at 252.[21]

Plaintiff seeks to prove her case using the *McDonnell-Douglas* framework. *See* Pl.'s Mem. 23-26. To show her prima facie case, Plaintiff must establish she participated in protected activity, RMC took an adverse employment action against her, and there was a causal link between the two. *Boyer-Liberto*, 786 F.3d at 281. In addition to claiming her termination was retaliatory, Plaintiff also argues Defendant retaliated against her "continuous complaints" by cutting down on her patient referrals, moving her to a smaller workspace, and taking away her "implied authority." Pl.'s Mem. 24.

### 1. Protected Activity

Plaintiff claims her "continued reports" regarding the purported hostile work environment are protected activities. In particular, Plaintiff states she went to speak with Interim Director Kim Stewart on March 29, 2012, and gave her a list of racial issues happening in the office. Pl.'s Dep. 101. At some point after March 29, 2012, Plaintiff testified she spoke on the telephone to Chief Nursing Officer Julia Yawn regarding "the racism that was going on in the office." *Id.* at 146. Plaintiff also recounts an April 2012 meeting among herself, some other nurses, and Yawn. *Id.* at 102, 143-44, 147. Plaintiff recalled that they "went over the list" and told Yawn what was happening. *Id.* Other than those specifics

---

[21] Although Defendant argues *Nassar*'s but-for causation standard is applicable at the prima facie causation stage, its brief was submitted several weeks before the *Foster* opinion was released.

regarding the March and April 2012 meetings, Plaintiff more generally submits her protected activity took place "when she spoke out against the race discrimination occurring in the office and when she spoke out about the missing monies in a January 24, 2013 meeting." Pl.'s Mem. 23.

Recently, the Fourth Circuit expanded the scope of what may be considered a protected activity in the Title VII retaliation context. In *Boyer-Liberto*, 786 F.3d at 282, the court "made clear that [courts] should [] interpret 'unlawful employment practice' [in the protected-activity realm] broadly." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416-21 (4th Cir. 2015) (quoting *Boyer-Liberto*, 786 F.3d at 282); *see Boyer-Liberto*, 786 F.3d at 282 ("[A]n employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress."). As explained in *Boyer-Liberto*, decisions from the United States Supreme Court require that "Title VII [] be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,' because 'effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances.'" *Boyer-Liberto*, 786 F.3d at 283 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–67 (2006)).[22]

Looking to the *Boyer-Liberto* decision, the *DeMasters*' court reversed the grant of summary judgment on a retaliation claim in part based on the district court's "myopic analysis" of the plaintiff's opposition as a series of discrete acts. *DeMasters*, 796 F.3d at 417. Rather, the court counseled as follows:

> We conclude from this review of the statute and case law that we must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole. Although individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective, the touchstone is whether the plaintiff's course of conduct *as a whole* (1) "communicates to her employer a belief that the employer has engaged in . . . a form of

---

[22] In *Boyer-Liberto*, the Fourth Circuit reversed the grant of summary judgment, finding that even the one-time use of an especially offensive racial epithet could be the basis for creating a protected activity for that plaintiff's retaliation claim.

employment discrimination," *Crawford [v. Metropolitan Government of Nashville and Davidson County, Tenn.*], 555 U.S. 271, 276 [(2009)]; and (2) concerns subject matter that is "actually unlawful under Title VII" or that the employee "reasonably believes to be unlawful," *Boyer–Liberto,* 786 F.3d at 282.

*DeMasters v. Carilion Clinic*, 796 F.3d at 418 (emphasis in *DeMasters*).

Defendant does not dispute that Plaintiff's complaints of race discrimination at an April 2012 meeting qualify as protected activity. Defendant takes issue, though, with Plaintiff's argument regarding her complaints about the "missing money." The undersigned agrees with Defendant that the January 2013 complaints regarding the "missing money" or write-offs do not qualify as protected activity for purposes of the prima facie retaliation claim.

Further, aside from the March 2012 and April 2012 discussions with Yawn, Plaintiff has not provided concrete evidence of reports she made concerning racial issues. Plaintiff's general testimony that she "continuously spoke out" about racial issues is insufficient.

In any event, Plaintiff's March and April 2012 specific complaints regarding racial issues— which are clearly issues protected by the civil rights laws—are considered protected activities. Based on the record, those complaints are the only protected activities Plaintiff has set out in her prima facie case. Plaintiff's vague argument that she "continued" to speak out concerning race issues is not sufficiently specific to be considered protected acts. In making this recommendation, the undersigned is aware of the guidance from *Boyer-Liberto* and *DeMasters* to view all evidence as a whole. Nonetheless, *DeMasters* also counsels that "individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective[.]" 796 F.3d at 418. Further, "protected acts" must include communicating to her employer the belief discrimination has taken place. *See id.* Plaintiff bears the burden of setting out evidence of her purported protected acts during the prima facie analysis. Plaintiff's vague suggestion that she continued to complain—without information regarding the specifics of the complaints or to whom they were made—does not suffice to create any "protected

acts" subsequent to the April 2012 discussions with Yawn. Similarly insufficient is her reference to "the testimony of Plaintiff, and Plaintiff's witnesses" that "shows that Plaintiff was consistently speaking up about her concerns of race discrimination to Defendant[.]" Pl.'s Mem. 25. For example, Plaintiff cites to the deposition of Kearse-Peeples in which she testified generally that Plaintiff "has always been very verbal and always stood up for those who [were] less verbal[.]" Kearse-Peeples Dep. 21. Kearse-Peeples also stated it was "on the agenda to try to terminate" Plaintiff. Kearse-Peeples 21. When asked about particulars to explain that statement, Kearse-Peeples was unable to provide specific incidents, stating instead, "I just knew that [Plaintiff] wasn't favored because she was outspoken and she was going to stand for what is right." *Id.* at 23. Further, in the Frazier deposition excerpt cited, the only specifics referenced were a meeting with Kim Stewart and a meeting with Yawn. Frazier Dep. 21. Other than the March and April 2012 complaints, this evidence provides no more specifics as to particular complaints related by Plaintiff, when they were given, or to whom.

Plaintiff's complaints at and/or subsequent to the January 24, 2013 staff meeting were about missing money. Plaintiff did not raise any race-related complaints during that meeting. Because questions and complaints about corporate fiscal issues do not relate to potential civil rights violations, the January 2013 complaints concerning money are not considered protected activity for purposes of this analysis.

Thus, the undersigned recommends a finding that the specifically established March and April 2012 complaints about racial issues are Plaintiff's only "protected activities" for purposes of establishing a prima facie claim of retaliation (as to her claims of retaliatory termination and as to the other allegedly retaliatory acts).

For the remaining analysis of Plaintiff's retaliation claim, the court considers the termination claim first, and then considers the other acts in turn.

### 2.  *Plaintiff's retaliatory-discharge claim*

Plaintiff must show she was subjected to an adverse action related to the protected activity. Unquestionably, Plaintiff's termination was an adverse action. The court now considers the third element of Plaintiff's prima facie case of retaliatory discharge—whether Plaintiff has set out a prima facie causal link between the above-discussed protected actions and her termination. Defendant argues Plaintiff cannot establish causation because the specific complaints of race discrimination from April 2012 were too distant in time to causally relate to her January 2013 termination. *See* Def.'s Mem. 23.

Plaintiff response largely focuses on her speaking out about the money issue raised in the January 24, 2013 meeting and her January 29, 2013 termination. *See* Pl.'s Mem. 23-24. Plaintiff also generally argues that she "continuously spoke out" against a hostile work environment, apparently implying her "continuous" "protected activity" sufficed to show a close temporal relationship between her activity and her termination. *Id.*

"[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (internal quotation marks omitted).

Here, the latest complaint about racial issues for which Plaintiff has provided any evidence was her April 2012 meeting with Yawn. She was terminated January 29, 2013, some nine months later. In *Clark,* the Supreme Court did not define "very close," but cited cases where adverse employment action was taken three months and four months after the protected activity as insufficient proximity. *See id.* at 273–74 (citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997), *Hughes v.*

*Derwinski,* 967 F.2d 1168, 1174–75 (7th Cir. 1991)); *Shields v. Fed. Exp. Corp.,* 120 F. App'x 956, 963 (4th Cir. 2005) (holding three-to-four months was insufficient temporal proximity); *Dix v. City of N. Myrtle Beach*, No. 4:14-CV-00780-RBH, 2015 WL 5089600, at *20 (D.S.C. Aug. 26, 2015) (finding complaint made September 19, 2012 and March 2013 termination too distant to support a prima facie case of causation in retaliation claim). *Cf. King v. Rumsfeld,* 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding inference of causation when termination occurred within two-and-one-half months of employer receiving notice of employee's EEOC filing). While other relevant evidence may be used to support a claim of causal connection when temporal proximity is lacking, *Lettieri v. Equant Inc.,* 478 F.3d 640, 650 (4th Cir. 2007), Plaintiff has not provided any such evidence. Here, Plaintiff fails to show a causal connection between her termination and her complaints, making summary judgment appropriate as to her Title VII claim for retaliatory termination.

As noted above, Plaintiff's claim that she continued to speak out does not suffice to demonstrate any later protected activity that would change the temporal analysis. It is recommended that summary judgment be granted as to Plaintiff's Title VII retaliatory discharge claim because she has not set forth a prima facie case.

In the event it were determined Plaintiff has established a prima facie case, summary judgment remains appropriate as to this claim. As more fully set out above in the Title VII discrimination analysis, Defendant has presented ample evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination: that she falsified mileage-reimbursement claims.

The burden then shifts to Plaintiff. The undersigned is of the opinion the evidence is insufficient for Plaintiff to establish the but-for causation required in establishing pretext. *See Foster*, 787 F.3d at 252 (noting a plaintiff is required to show retaliation was the "'real reason'" for the action, or, in other words, "to show that the harm would not have occurred in the absence of—that is, but-

for—the defendant's conduct.'") (quoting *Holland v. Wash. Homes*, 487 F.3d 208, 218 (4th Cir. 2007) and *Nassar*, 133 S. Ct. at 2525).

Plaintiff argues that "the audit was a pretext for Plaintiff's termination." Pl.'s Mem. 25. Taking that point to its conclusion does not require a different result. The only competent record evidence regarding the reason the audit was undertaken is that Hill was instructed by his superiors to look at expenses and cut costs where possible. Plaintiff has not presented evidence that would permit a reasonable juror to determine the mileage audit would not have taken place but for retaliatory purposes aimed at Plaintiff.

Summary judgment is appropriate as to Plaintiff's Title VII claim for retaliatory discharge.

### 3. *Other allegedly retaliatory actions*

Plaintiff also argues Defendant retaliated against her "continuous complaints" by cutting down on her patient referrals, moving Plaintiff to a smaller workspace, and taking away her "implied authority." Pl.'s Mem. 24.

### i. Reduced referrals

Plaintiff claims her referrals were reduced from 15-to-20 visits per week to 4-to-5 visits per week.[23] Plaintiff takes the position Dantzler changed the referral process for "discriminatory purposes." *See* Pl.'s Mem. 11. In particular, Plaintiff complains that the number of referrals she received was reduced because Dantzler "changed the protocol" regarding how social-work referrals were made. Before the change in protocol, Plaintiff states the nurses were the ones to give Plaintiff referrals of patients. Dantzler determined the nurses were to give social-work referrals to Patient Care Coordinator Dantzler, who would then assign them to a social worker. *See* Pl.'s Dep. 99-100. In support, Plaintiff cites to her own deposition testimony of how the process had worked prior to the

---

[23] The time period over which this reduction took place is not clear.

change. *See* Pl.'s Mem. 10 (citing Pl.'s Dep. 99-100, 149). She argues the changed process, which was also continued by Hopkins and Hill, effectively violated "their own Policies and Procedures." Pl.'s Mem. 11 (citing Compl. ¶ 16). Plaintiff does not explain the legal significance of such policy "violations." In support of her argument that Dantzler had changed the process for discriminatory purposes, Plaintiff proffers the testimony of former co-worker and nurse, Frazier. Frazier testified that "sometime between 2010 and—whatever time [Dantzler] left," Dantzler told the nurses to "cut down on [their] referrals to the social worker." Frazier Dep. 18-19. When asked in deposition why she felt the change was discriminatory, Frazier indicated it was because Plaintiff was the only social worker. Frazier Dep. 24.

Defendant submits that, even assuming for purposes of this motion this change happened, there is no evidence that such a request was based on Plaintiff's race. Def.'s Mem. 20. As an initial point, Defendant notes it was the Patient Care Coordinator's job to schedule patient visits and coordinate the schedules of all clinical staff. Defendant provides the Home Care policy on "Medical Social Services," which specifically provides that "Medical social services are provided at the direction of the Patient Care Coordinator or designee, in accordance with the Agency's job description, according to state and national professional standards of practice and under the direction of the patient's physician." *See* Policy, ECF No. 36-4 at 12. The Patient Care Coordinator did not generate social work referrals. Social work referrals were generated by the Admissions Nurse with approval from a physician. They were then given to the Patient Care Coordinator. Dantzler stated she had never instructed nurses to give Plaintiff's referrals to her in order to decrease the number of referrals Plaintiff received. Further, Dantzler indicated "if a doctor or Admissions Nurse gave [Plaintiff] a referral, there was no way [Dantzler] could have kept her from seeing the patient." Dantzler Aff. ¶ 16. Defendant does not dispute that Plaintiff's case load decreased to four-or-five visits per week, but notes that change was a function

of the referrals being made by physicians—not based on actions of Dantzler, Hopkins, or Hill. Def.'s Mem. 6, 21.

Defendant further notes Plaintiff was salaried, so the number of referrals did not impact her pay. *See* Pl.'s Dep. 107. Defendant submits that a changed workload, without a change in pay is not considered an "adverse action" for purposes of Plaintiff's prima facie retaliation claim. Def.'s Mem. 20-21 (citing cases). Without addressing the legal argument of whether her reduced workload could be considered an adverse employment action in this context, Plaintiff contends the absence of an income reduction is "irrelevant" because she never argued her income was diminished. Pl.'s Mem. 11. Rather, Plaintiff cites to paragraph 16 of her Complaint, in which she averred Hopkins and Hill continued to encourage a racially hostile work environment by reducing Plaintiff's workload, "effectively violating their own Policies and Procedures." *Id.*, Compl. ¶ 16.

As an initial matter, the undersigned notes that several of the cases Defendant cites in support of its argument considered the "adverse employment action" issue in connection with Title VII discrimination claims. In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)*, however, the Supreme Court clarified that a different and less strenuous standard is used to define adverse employment actions in the retaliation context as opposed to other Title VII contexts: "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington,* 548 U.S. at 64. Nonetheless, a plaintiff must show the retaliation produced an "injury or harm." *Id.* at 67 (noting the anti-retaliation provision of Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations

omitted). A plaintiff must show material adversity to separate the significant harms from the trivial because "Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)). The test is an objective one and considers the reactions of a reasonable employee. *Id.* It is the challenged retaliatory act, not the underlying conduct that gave rise to the Title VII complaint, that is to be examined using this guidance. 548 U.S. at 69. The question is whether the challenged action was material from the perspective of a reasonable person in the plaintiff's position. *Id.* at 69–70.

Even under this more lenient definition in the retaliation context, the undersigned is of the opinion that a reasonable person would not consider Plaintiff's reduced case load with no change to her salary to be materially adverse. In making this recommendation, the undersigned notes that the complained-of "policy change" does not seem to be a change in any actual "policy." Rather, Patient Care Coordinator Dantzler's advising her nursing staff that social-work referrals should flow through her is in accordance with the only written policy on the issue in this record. *See* ECF No. 36-4 at 12. Further, in her deposition, Plaintiff acknowledged she was the only social worker on staff and that, to her knowledge, no one else got social-work referrals. Pl.'s Dep. 107.

In any event, even if the revised protocol that resulted in a reduced case load could be considered an adverse action in this context, Plaintiff cannot establish the final prong of the Title VII retaliation prima facie case: that a causal connection existed between the actions and Plaintiff's alleged reporting of racial discrimination. Plaintiff argues Frazier's testimony that Dantzler advised the nurses to begin sending social-work referrals through her (Dantzler) "clearly conflicts with Dantzler's testimony," creating a "genuine issue of material fact, because a reasonable jury could find that Ms. Dantzler instructed the Nurses to limit their referrals to Ms. Yon for discriminatory purposes." Pl.'s Mem. 11. Plaintiff does not explain to what testimony from Dantzler she is referring. In any event, the

34

undersigned is of the opinion that Plaintiff's proffered evidence does not provide a sufficient causal link to establish a prima facie case of discrimination.

To the extent Plaintiff's argument is that Dantzler's and Fraizer's testimony create issues of fact as to whether Dantzler ever told the nurses to send social-work referrals through her, such an "issue of fact" does not necessarily require denial of summary judgment. For purposes of this motion, the undersigned accepts Frazier's testimony regarding what she heard Dantzler say in a meeting. However, Frazier's supposition that Dantzler's instruction to the nurses not to refer matters to social workers directly was racially discriminatory because Plaintiff was the only social worker on staff is far too speculative to provide the required link. Nor can Plaintiff's own similar supposition demonstrate prima facie causation. A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis*, 53 F.3d at 62.

Because Plaintiff has not established a prima facie case that her workload was reduced for retaliatory purposes, Defendant's motion should be granted as to this portion of her Title VII retaliation claim.

However, even assuming, *arguendo*, that Plaintiff has established a prima facie claim of retaliation as to the reduction in case load, Plaintiff cannot demonstrate the but-for causation required at the pretext stage. *Foster*, 787 F.3d at 252. Defendant has demonstrated a legitimate, nondiscriminatory reason for any changed protocol by noting HCC's policy that medical social services are provided "at the direction of the Patient Care Coordinator." ECF No. 36-4 at 12. Further, Defendant notes that the Patient Care Coordinator does not *make* the referrals, physicians do. Plaintiff acknowledged that she was the only social worker and to her knowledge no one else received social-

35

work referrals. Accordingly, Defendant's instruction that referrals were to go through the Patient Care Coordinator did not impact the number of social-work referrals there were. It would be the number of referrals, not the protocol concerning the workflow of the referrals, that would be the cause of Plaintiff's reduction in caseload. Plaintiff cannot establish the necessary but-for causation, and summary judgment is appropriate as to her retaliation claim concerning her reduced case load.

<ol type="i" start="2"><li>Workspace reassignment</li></ol>

Plaintiff alleges the moving of her workspace by her former supervisor, Dantzler, took place in retaliation against her because of her protected activity. Plaintiff indicates she was moved from an office to a "small workspace among the other nurses." Pl.'s Mem. 5. Co-worker Tracy Stillinger, a white female, was moved into Plaintiff's former office.

Defendant acknowledges Plaintiff's work station was moved in 2012 because of the need to consolidate workspace when HC no longer leased certain office space. Dantzler explained Plaintiff was moved from the small office she had been assigned because her office was needed for newly hired Data Entry Clerk Stillinger. Dantzler Aff. ¶ 18, ECF No. 36-6. As explained by Dantzler, Stillinger worked on a computer in the office all day long while Plaintiff was only at the office in the morning and late afternoon. There were no other offices available in which to locate Stillinger. *Id.* Defendant acknowledges Plaintiff did not like the move and complained that she needed the office for confidential meetings with patients. Dantzler Aff. ¶ 19. Dantzler indicated most of Plaintiff's confidential meetings took place in patients' homes, and that she "seldom talked to patients in the office." *Id.* ¶ 18. Dantzler acknowledged Plaintiff did occasionally have people meet her at the office for conferences, and that she had been told she could use someone's office or the conference room when needed. *Id.* ¶ 19.

Defendant argues that, under the *McDonnell Douglas* analysis, set out above, Plaintiff cannot establish a prima facie case of retaliation because Plaintiff's changed workspace was not a "materially adverse" event. *See Burlington Northern*, 548 U.S. at 68. Defendant notes Plaintiff's new workspace was identical to other members of HC's clinical staff.

Plaintiff never specifically addresses the legal argument regarding whether the workspace move was materially adverse. Rather, she spends several pages of her "Statement of Facts" setting out her disagreement with the decision to move her to a different workspace. *See* Pl.'s Mem. 5-8. In large part, her focus is on minor factual points. For example, Plaintiff questions the reasons given for moving Plaintiff, noting Dantzler had not indicated Plaintiff "never talked to patients in her office." Pl.'s Mem. 5. She continues by claiming the move did not afford her the privacy she needed. She indicated she had encountered "an incident" when the conference room had not been available and suggests there were other ways office space could have been found for Stillinger. Pl.'s Dep. 7-11. Plaintiff concludes by arguing that, "a reasonable jury can conclude that there were other solutions to the office space issue (i.e., the Coders could have shared an office, or [Plaintiff] could have shared an office with the Intake Coordinator), and that Ms. Dantzler's motive for removing [Plaintiff] from her office were racially motivated (based off of witness depositions and affidavits)." Pl.'s Mem. 7-8.

The undersigned agrees with Defendant that Plaintiff has not set out a prima facie case of retaliation as to the workspace change. Contrary to Plaintiff's argument, the question at this juncture is not whether a different office-space solution could have been figured out. Rather, the court must first determine whether a "reasonable employee would have found the challenged action materially adverse." *Burlington Northern*, 548 U.S. at 68. Plaintiff has not set out enough to satisfy this standard. Asking an employee to perform their job in a different work station, without other changes, particularly when her new work station is in the same area as other members of the clinical staff, was

not a materially adverse action. *See, e.g., Mack v. S. C. Dep't of Transp.*, No. CA 3:12-2960-MGL-KDW, 2015 WL 1297836, at *19 & n.22 (D.S.C. Jan. 28, 2015) *report and recommendation adopted,* No. 3:12-CV-2960-MGL, 2015 WL 1297876 (D.S.C. Mar. 23, 2015) (move to cubicle not "materially adverse" event to satisfy prima facie retaliation claim).

Even if Plaintiff were considered to have established the "materially adverse" portion of her prima facie claim, she cannot show the third prong—a causal link between the move and her protected activity. Plaintiff again seems to rely on unspecified "witness depositions and affidavits" to show the causal link. Pl.'s Mem. 8. That Plaintiff has not directed the court to the specific "witness depositions and affidavits" showing her workspace move was "racially motivated," Pl.'s Mem. 7-8, is reason enough to find Plaintiff has not set forth a sufficient causal link. *E.g.*, *Foster*, 787 F.3d at 250 (noting plaintiff has burden of establishing causal link in prima facie case and in pretext context); *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (noting plaintiff has burden of establishing prima facie case). Moreover, the undersigned has reviewed the specific record evidence relied on by both parties herein, and is not aware of deposition or affidavit testimony providing a causal link between Plaintiff's protected activity and the cubicle move. Summary judgment is appropriate.

Were it to be determined Plaintiff has set forth a prima facie claim of retaliation as to her workspace change, Plaintiff cannot demonstrate the but-for causation required at the pretext stage. *Foster*, 787 F.3d at 252. Defendant has demonstrated a legitimate, nondiscriminatory reason for any change, noting the loss of office space and the need for private office space for a new employee who would work in that office all day. Plaintiff acknowledged that she spent the majority of her work days on the road. Pl.'s Dep. 5.

The burden then shifts back to Plaintiff to establish that her office space would not have been moved but for Defendant's intent to retaliate against her based on her protected activity. *See Yashenko*

38

*v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2005) (noting if a plaintiff puts forth a prima facie retaliation case, defendant must offer a nondiscriminatory explanation for the action and then the burden of proof returns to plaintiff to show the employer's proffered explanation is pretextual). Because Plaintiff cannot establish the necessary but-for causation to carry her pretext burden, *Foster*, 787 F.3d at 252, summary judgment is appropriate as to her retaliation claim concerning her workspace change.

### iii.   Change in Job Description/Removal of Supervisory Authority

Finally, Plaintiff submits Dantzler "changed her job description" to remove supervisory authority from her. *See* Compl. ¶ 14. In seeking summary judgment, Defendant submits there is no evidence to indicate Dantzler (or anyone) ever changed Plaintiff's job description. Defendant proffers Dantzler's affidavit that she had nothing to do with setting Plaintiff's job description, nor could she change it. Dantzler Aff. ¶ 17. Further, Defendant provides two job descriptions from Plaintiff's personnel file, both of which note the positions have no supervisory responsibilities. Attachments 1 and 2 to Harris Aff.; ECF No. 36-4 at 5-10. Defendant also notes a Medical Social Services Policy that includes a list of services that may be offered by a qualified medical social worker assistant "under the supervision of a qualified medical social worker." ECF No. 36-4 at 12-14. However, RMC has never employed a social worker assistant, and Plaintiff admitted she had never had a social worker assistant work with her while employed at RMC. Pl.'s Dep. 165-66.

In response, Plaintiff acknowledged none of the job descriptions for Social Worker include supervisory responsibility. Pl.'s Mem. 8-9. Rather, Plaintiff continues to pursue this portion of her claim by arguing that "the supervisory authority that was stripped from [Plaintiff], by Ms. Dantzler, was an implied supervisory authority and not an expressed supervisory authority." *Id.* at 8. Nonetheless, Plaintiff presents her deposition testimony in which she indicated she did a "form of

supervising" by working with "the social workers and student [interns]." Pl.'s Dep. 27-28. Submitting she had the implicit "power to supervise," Plaintiff ends this portion of her argument by claiming "Dantzler's actions toward [Plaintiff] were crafted in order to take away the implied supervisory authority." *Id.* at 9. Plaintiff submits Dantzler "stripped [Plaintiff] of the authority to supervise student interns." *Id.* She claims there is a genuine issue of material fact as to whether Plaintiff had implied supervisory authority, and seeks denial of summary judgment.

As noted by Defendant on reply, Plaintiff's argument simply misses the point. Def.'s Reply 9. To proceed on this portion of her retaliation claim, Plaintiff would need to demonstrate Dantzler took actions to strip supervisory authority away from Plaintiff's job description and that such actions were the result of Plaintiff's protected activities. Plaintiff has provided no such evidence. Giving Plaintiff every benefit of the doubt and assuming, *arguendo*, the issue was whether Dantzler wrongly stripped Plaintiff of even "implied authority to supervise interns," Plaintiff's prima facie case fails. Plaintiff's general deposition testimony that she sometimes supervised interns is insufficient. Plaintiff has provided no evidence that any social-work student interns even worked with HC during the relevant time period, let alone any evidence that Dantzler ever prevented her from supervising student interns. Summary judgment is appropriate as to this portion of Plaintiff's retaliation claim.

ii. Hostile Work Environment/Harassment Claim

Plaintiff's last Title VII claim is one for a racially hostile work environment. Compl. ¶¶ 35-39 (claiming that, after complaining of racial issues, she "endured an increase" in harassment prior to her termination; listing adverse terms and conditions as having been stripped of her supervisory ability and that "they refused to refer any Patients to her").

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). "[T]o prevail on a Title VII claim that a workplace is racially hostile, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto*, 786 F.3d at 277 (internal citation, alteration, and quotation marks omitted).

In arguing against summary judgment as to this claim, Plaintiff briefly submits the following to demonstrate she has satisfied the four elements of a prima facie claim:[24]

(1) The conduct was unwelcome, as demonstrated by the fact that she "continuously reported her concerns to upper management." Pl.'s Mem. 31;

(2) The conduct took place due to her race, as demonstrated by her being moved out of office space, stripped of authority, and having her referrals cut. Further, Plaintiff argues the "above facts, and witness testimony, also show that the Defendant's Agents had a propensity for favoring Caucasian employees over African Americans." *Id.*;

(3) The conduct was sufficient to create an actionable abusive, hostile work environment because she was forced to work in inadequate space, "subjected to Ms. Dantzler's constant abusive attitudes when she (Ms. Dantzler) told Ms. Shuler to find issues with Plaintiff's job performance;" she was "subjected to Ms. Dantzler's constant (and continuous) insults;" and Dantzler told nurses to cut back on patient referrals." *Id.*; and

---

[24]In large measure, the claims Plaintiff lists in support of the harassment cause of action dovetail with Plaintiff's non-termination retaliation claims, making much of the above discussion relevant here. This is unsurprising as "[r]etaliation claims under Title VII can be based on an employer's retaliatory creation of a hostile work environment." *Fordyce v. Prince George's Cnty.,* 43 F. Supp. 3d 537, 552 (D. Md. 2014) (citing *Von Gunten v. Maryland,* 243 F.3d 858, 869 (4th Cir. 2001), *overruled on other grounds by Burlington Northern,* 548 U.S. at 67-68)). To have the creation of a hostile work environment be considered retaliatory for Title VII purposes, though, a plaintiff "must show a *prima facie* case for retaliation, including evidence that her employer's adverse actions amount to a hostile work environment." *Id.* Because, as discussed within, Plaintiff has not demonstrated the existence of a hostile work environment, she cannot set out a prima facie claim of retaliation in that manner.

(4) Plaintiff regularly reached out to Yawn, who was "Defendant's Agent," but Yawn "failed to do an investigation into Plaintiff's allegations of being subjected to a racially hostile work environment." *Id.*

Having reviewed the evidence and argument, the undersigned is of the opinion Plaintiff cannot set out a prima facie case for Title VII harassment. For argument's sake, the undersigned accepts the conduct was unwelcome, thereby satisfying the first element. Plaintiff cannot establish the second or third elements, however. In considering these elements, the court notes Plaintiff has offered no further explanation and no legal analysis regarding how the complained-of actions and inactions took place "because of her race" or how they are sufficient to create a prima facie case for conduct "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment." 786 F.3d at 277.

Regarding the second element, as discussed in connection with Plaintiff's retaliation claims, she has not presented competent evidence that she was stripped of any supervisory authority, nor has she shown race-based animus caused her to be moved from her private office to a workstation with the other clinical staff or caused a decrease in her patient referrals. Further, Plaintiff has not set out competent evidence demonstrating Defendant's alleged "propensity for favoring Caucasian employees over African Americans." Pl.'s Mem. 31. As discussed more fully above, the evidence Plaintiff has presented to this effect is speculative at best and not competent to provide evidence of this element. *See Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995) (conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment); *Ennis,* 53 F.3d at 62 ("[m]ere unsupported speculation ... is not enough to defeat a summary judgment motion"); *cf. Penn v. Citizens Telecom Servs. Co., LLC*, 999 F. Supp. 2d 888, 898-901 (S.D.W. Va. 2014) (finding plaintiff's unsupported claim that a comment had "significant and far-reaching effects" on her work conditions insufficient to establish prima facie hostile work environment

claim). *E.g.* Kearse-Peeples Dep. 42-43 (stating Dantzler's Caucasian friends "got away with things that African-Americans would not get away with," but being unable to provide any specific examples of such disparate treatment).

In support of the third element—that the conduct was "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment," 786 F.3d at 277—Plaintiff relies in part on her changed workspace and the decrease in referrals. For the reasons discussed above in connection with her other Title VII claims, Plaintiff has not shown the change in her workspace or the decreased referrals had an impact on her conditions of employment. The other evidence to which Plaintiff refers in support of showing severity and pervasiveness for purposes of showing an abusive work environment focus on the conduct of Dantzler.

In addition to Plaintiff's claim of Dantzler's involvement in reducing the number of cases referred to Plaintiff, Plaintiff specifically points to Dantzler's "constant abusive attitudes when she (Ms. Dantzler) told Ms. Shuler to find issues with Plaintiff's job performance;" and claims she was "subjected to Ms. Dantzler's constant (and continuous) insults." Pl.'s Mem. 31. The only evidence of record regarding Dantzler's supposed instruction to Shuler that she was to find issues with Plaintiff's work performance comes from Plaintiff—not Shuler. In Plaintiff's deposition, she testified that, sometime around October 2012, she had spoken with former HC employee Charlotte Shuler, who was "something like an auditor" who "went behind us [presumably HC employees] and checked our documentation, payor review, what have you." Pl.'s Dep. 95. Plaintiff testified that she had called Shuler, and Shuler said Dantzler had instructed her (Shuler) to "find problems with" Plaintiff's work, and "even if there wasn't any problems to find some[.]" *Id.* Plaintiff's testimony regarding a conversation with Shuler in which Shuler relayed what Dantzler had said is inadmissible hearsay. *See Greensboro Prof'l Fire Fighters Ass'n*, 64 F.3d at 967 ("[E]vidence [that] consists of inadmissible

hearsay . . . is neither admissible at trial nor supportive of an opposition to a motion for summary judgment."); *Md. Highways Contractors Ass'n v. State of Md.,* 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."); *see also* Fed. R. Civ. P. 56(c)(2).

Plaintiff is not specific regarding Dantzler's "constant (and continuous) insults." Pl.'s Mem. 31. In examining the "severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Boyer-Liberto*, 786 F.3d at 278 (internal citation and quotation marks omitted). Unquestionably, Yawn had supervisory authority over Plaintiff. However, the undersigned is unaware of any specific "insults" Plaintiff attributes directly to Dantzler. To the extent Plaintiff is referring back to the testimony of Kearse-Peeples regarding Dantzler, that testimony is not sufficient to demonstrate conduct existed that was "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment," 786 F.3d at 277. In addition, when asked specifically about whether she had witnessed Dantzler take any actions that were racially discriminatory against Plaintiff, Kearse-Peeples indicated "the whole staff," including Dantzler, would "throw around racial jokes and slurs." *Id.* at 41. Kearse-Peeples testified could not remember the jokes or slurs specifically and noted they did not take place often—maybe "one or two a year or so." when Kearse-Peeples worked at HC with Plaintiff. *Id.* at 41-42. Nor is Kearse-Peeples' statement that Dantzler would just "look" at Plaintiff when Plaintiff went to Dantzler with concerns "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment." 786 F.3d at 277. Kearse-Peeples cannot be aware of all interactions between Plaintiff and Dantzler, nor is the "silent treatment" actionable under ordinary circumstances. *See Streiff v. Anne*

*Arundel Cnty. Bd. of Educ.*, No. CCB-13-845, 2014 WL 7212604, at *4 (D. Md. Dec. 18, 2014) (in ADA retaliation context).

In considering the third element, the undersigned has also considered the inappropriate remarks Plaintiff testified she overheard coworker McAlhany make. Although Plaintiff never references McAlhany's comments in claiming she has set out a prima facie harassment claim, *see* Pl.'s Mem. 31, elsewhere in her memorandum, Plaintiff referenced statements she heard McAlhany make. *See* Pl.'s Mem. 15; Pl.'s Dep. 96 (Plaintiff's stating she overheard McAlhany tell another coworker she was "going to get rid of those black troublemakers in the office" and that "blacks get too many free things such as cell phones and food stamps.") Plaintiff characterizes McAlhany's remarks as "racially discriminatory," and submits they are attributable to RMC. Pl.'s Mem. 12-13.

McAlhany was a coworker and had no supervisory authority over Plaintiff. McAlhany Aff. ¶ 2. Moreover, it is unnecessary to analyze in depth whether McAlhany's comments could be attributable to Defendant. McAlhany's two overheard comments do not rise to the level of creating a hostile work environment. *See generally Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 226 (1st Cir. 2012) ("stray remarks," even if they may be offensive, cannot constitute a hostile work environment claim). Further, the undersigned has considered McAlhany's comments in connection with the other competent evidence presented by Plaintiff in support of her hostile-work-environment claim. Even so, the undersigned is of the opinion that Plaintiff has not satisfied the severe-or-pervasive element. This element has both subjective and objective components. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003). Thus, Plaintiff must present evidence showing that all such evidence, considered together, was severe or pervasive to her personally and that it would be considered abusive to a reasonable person in her position. *Id.* (*citing Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998)). In determining whether the conduct would be considered abusive to a reasonable person in

45

Plaintiff's position, a court must "consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id. (quoting Harris,* 510 U.S. at 23). As the Fourth Circuit and the United States Supreme Court have explained, "[t]his standard is designed to 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes, and occasional teasing.'" *Id.* (*quoting Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)). Here, the only specific comments for which Plaintiff has presented evidence, although inappropriate, were not racial slurs or epithets. Plaintiff has not provided sufficient evidence of an atmosphere so severe and pervasive it created an actionable hostile work environment. Summary judgment is appropriate as to Plaintiff's Title VII harassment claim.[25]

Because summary judgment is recommended as to all of Plaintiff's Title VII claims, the court need not consider the impact after-acquired evidence of alleged employee misconduct on Plaintiff's potential remedies. *See* Def.'s Mem. 31-34, Pl.'s Mem. 32-34.

C.  Breach of Contract

In addition to her Title VII claims, Plaintiff brings state-law-based claims for breach of contract and breach of contract with fraudulent intent. Compl. ¶¶ 40-52. In responding to Defendant's Motion for Summary Judgment, Plaintiff clarifies that she bases her breach-of-contract claim on Defendant's alleged breach of a contract created between employee and employer by failing to follow the "Four

---

[25] The undersigned further notes Plaintiff's attempt to satisfy the fourth element of her harassment claim—that the abusive conduct is attributable to the employer. Plaintiff submits she regularly reached out to Yawn, who was "Defendant's Agent," but Yawn "failed to do an investigation into Plaintiff's allegations of being subjected to a racially hostile work environment." Pl.'s Mem. 31. However, the fourth element need not be considered as Plaintiff has not set out a prima facie claim of sufficiently abusive conduct that took place because of race.

Step Communication and Reporting Process" and "Non-Retaliation Policy," both set out in RMC's Code of Conduct. Pl.'s Mem. 27-28.[26]

South Carolina has long recognized the doctrine of employment-at-will. *Prescott v. Farmers Tele. Coop., Inc*., 516 S.E.2d 923, 925-59 (S.C. 1999). Generally, an at-will employee may be terminated at any time for any reason or for no reason, with or without cause, subject to narrow exceptions and prohibitions against illegal discrimination. *Stiles v. Am. Gen. Life Ins. Co.,* 516 S.E.2d 449, 450 (S.C. 1999). However, in certain situations, the at-will status of an employee may be altered by the terms of an employee handbook or similar document, such that an employee may bring a cause of action for wrongful discharge based on breach of contract. *Hessenthaler v. Tri-County Sister Help, Inc.,* 616 S.E.2d 694, 697 (S.C. 2005).

Section 41-1-110 of the South Carolina Code similarly provides, "It is the public policy of this State that a handbook, personnel manual, policy, procedure, or other document issued by an employer or its agent after June 30, 2004 shall not create an express or implied contract of employment if it is conspicuously disclaimed." S.C. Code Ann. § 41-1-110.  As explained in *Grant v. Mount Vernon Mills, Inc.*, "A handbook [or similar document issued by employer] forms an employment contract when: (1) the [] provision(s) and procedure(s) in question apply to the employee, (2) the handbook [or Code of Conduct] sets out procedures binding on the employer, and (3) the handbook [or Code of Conduct] does not contain a conspicuous and appropriate disclaimer." 634 S.E.2d 15, 20 (S.C. Ct. App. 2006).

Here, Plaintiff looks to RMC's Code of Conduct. Code of Conduct, ECF No. 38-29. The final page of the Code of Conduct is a "Certification and Acknowledgement" signed by Plaintiff on April

---

[26] In her response, Plaintiff acknowledges having signed a disclaimer upon receipt of the Employee Handbook. Pl.'s Mem. 27. She does not base her contractual claims on the Handbook.

14, 2005. *Id.* at 12.[27] The Certification and Acknowledgement does not contain a disclaimer. Plaintiff

submits Defendant has violated the Four Step Communication and Reporting Process, which provides:

> If you have a question or concern about an activity being unethical, illegal or wrong, use the following process to answer questions and reporting concerns. Throughout this process your identity will be kept confidential as much as possible.

1. Talk to your supervisor or department chair for medical staff. He or she is most familiar with the laws, regulations and policies that relate to your work.
2. If you are uncomfortable contacting your supervisor or if you do not receive an adequate response, talk to the next person in the chain of command. You may also choose to speak with the director of Human Resources.
3. If you have followed either #1 or #2 and still have questions, contact our Corporate Integrity Officer at [].
4. If for any reason you feel you cannot follow the above steps, or do not want to give your name, call the [RMC] Compliance Hotline at [] The [RMC] Corporate Integrity Officer will review and address all reports to the Hotline.

ECF No. 38-29 at 12.

When reviewing company policies in a breach of contract action, the court must consider

whether, *as a matter of law*, the policy contains a promise that may be the basis of a contract. *King v.*

*Marriot Int'l, Inc.,* (D.S.C. 2007), *aff'd* 267 Fed. Appx. 301 (4th Cir. 2008). It must be considered

whether a handbook or policy contains "mandatory language sufficient to alter the presumption in

South Carolina of an at-will employment relationship." *Dune v. G4s Regulated Sec. Sols., Inc.*, No. CA

0:13-1676-JFA-BM, 2014 WL 7920436, at *18 (D.S.C. Dec. 15, 2014) *report and recommendation*

*adopted,* No. 0:13-CV-01676-JFA, 2015 WL 799523 (D.S.C. Feb. 25, 2015). Further, "[u]nder South

Carolina law, a general policy statement is enforceable as a contract only if the statement is '*definitive*

*in nature, promising specific treatment in specific situations.*'" 520 F. Supp. 2d at 756. (quoting

*Hessenthaler,* 616 S.E. 2d at 698).

---

[27] Although the Certification of Acknowledgement is dated in 2005, each page of the Code of Conduct provided by Plaintiff contains the date "March 2011." ECF No. 38-29 at 2-11. Defendant includes the same March 2011 Code of Conduct. ECF No. 36-4 at 75-83. Defendant has included a Certification and Acknowledgement signed by Plaintiff on July 31, 2008. *Id.* at 16. These differences in dates do not impact the recommendation within.

Having considered the parties' arguments, the undersigned recommends summary judgment be granted as to the breach of contract claim. Plaintiff argues the steps set out above are "clearly mandatory steps that must be followed when an employee has concerns," and she submits she followed this procedure "when she brought her concerns of a racially hostile work environment and the missing money to the Defendant[.]" Pl.'s Mem. 27. Plaintiff submits that Defendant "breached the contract when [it] failed to follow [its] own Four Step Communication and Reporting Process." *Id.* She also asserts Defendant breached this process by failing to "conduct an investigation" into Plaintiff's allegations. Pl.'s Mem. 26.

The plain language of the Four-Step Process, though, does not include language sufficiently "mandatory" to create a potential contract of employment that could be considered breached if not precisely followed. Progressive disciplinary policies offer examples of procedures that may present jury issues as to whether they contain enforceable promises actionable under South Carolina law. *See e.g. Connor v. City of Forest Acres,* 560 S.E.2d 606, 611 & n.4 (S.C. 2002) (finding summary judgment inappropriate when progressive disciplinary policy provided that violations of certain codes "will be disciplined," such discipline "shall be of an increasingly progressive nature," and all employees "shall be treated" fairly and consistently). When such progressive disciplinary procedures are sufficiently "definite and mandatory, these procedures impose a limitation on the employer's right to terminate an employee at any time for any reason." *Hessenthaler*, 616 S.E. 2d at 698. The procedure relied on by Plaintiff contains no such mandatory language.

Further, the procedure itself is focused on what the employee should do. Step Four indicates the Corporate Integrity Officer "will review and address all reports to the Hotline." Plaintiff has not indicated she reported to either the Integrity Officer or the Hotline, so it is unclear how Defendant is alleged to have breached any "promise" created by this Process. Moreover, although Plaintiff suggests

Defendant breached this procedure by failing to "conduct an investigation," the plain language of the Process does not promise, or even necessarily imply a full investigation will take place. Rather, the Process indicates to whom an employee may go with questions or concerns and indicates all reports to a Hotline will be reviewed and addressed. Plaintiff has not created a jury issue as to whether a contract existed or was breached. Summary judgment is appropriate as to the breach of contract claim based on the Four-Step Process.

Plaintiff also submits Defendant violated the Code of Conduct's "Non-Retaliation Policy," which provides:

> No disciplinary action or retaliation is taken against any individual who reports a perceived issue, problem, concern or violation to management, Human Resources, Corporate Integrity or the Compliance Hotline "in good faith." The "in good faith" requirement means an employee actually believes or perceives the information reported to be true.

ECF No. 38-29 at 13. Plaintiff argues the non-retaliation language is "mandatory." Pl.'s Mem. 28. She also quotes a portion of the Code of Conduct that indicates "[s]upervisors are responsible for maintaining a workplace environment that stresses commitment to compliance with the *Code of Conduct* . . . [and ensuring employees] [r]eceive, read and understand the *Code*." *Id.* (quoting ECF No. 38-29 at 10) (alternation amended).

Plaintiff submits Defendant breached a contract with her by failing to follow the Code of Conduct in terminating her in retaliation for her having "voiced her concerns about missing money, and after they lowered Plaintiff's patients referrals, removed Plaintiff from her office, and by taking away Plaintiff's implied authority after she continuously voiced her concerns over working in a racially hostile work environment (as stated above in the Kearse-Peeples Deposition)." *Id.*

Defendant submits this portion of the Code of Conduct does not form the basis of a binding employment contract under South Carolina law. The undersigned agrees. As explained in

*Hessenthaler*, general policy statements to follow the law "do[] not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired." 616 S.E. 2d at 698. RMC's "Non-Retaliation Policy" provides that no disciplinary action or retaliation will be undertaken against those who report certain matters. This Policy is aspirational in tone and includes no mandatory language. *King*, 520 F. Supp. 2d at 756 (finding employer's "Policy on Harassment & Professional Conduct" and its promise that "there will be no discrimination or recrimination against an employee who asserts a complaint against [the employer] does not create an expectation that employment is guaranteed or that a particular process must be complied with before an employee is terminated") (internal quotations omitted)); *see also Brailsford v. Fresenius Med. Ctr. CNA Kidney Centers LLC*, No. 2:15-CV-00239-DCN, 2015 WL 4459032, at *4 (D.S.C. July 21, 2015) (dismissing claims for breach of employment contract and breach of contract accompanied by fraudulent act, noting courts have found anti-retaliation policies to be insufficient to form a contract of employment); *Young v. Roper St. Francis Healthcare*, No. CA 2:12-2337-RMG-BM, 2012 WL 6186197, at *5 (D.S.C. Nov. 9, 2012) (granting defendant's motion to dismiss breach of employment contract claim and collecting cases finding only mandatory policies can alter at-will employment status), *report and recommendation adopted,* No. 2:12-CV-2337-RMG, 2012 WL 6193888 (D.S.C. Dec. 12, 2012).

The portions of the Code of Conduct upon which Plaintiff relies do not alter her at-will-employment relationship with Defendant; therefore, there is no contract of employment that could be breached. Summary judgment is appropriate as to Plaintiff's breach of contract claim.[28]

D.  Breach of Contract Accompanied by a Fraudulent Act

---

[28] Even if it were assumed an employment contract existed, as discussed above, Plaintiff cannot establish retaliation took place. Accordingly, she has not established any actionable breach.

51

Plaintiff has also brought a cause of action for breach of her employment contract with RMC accompanied by a fraudulent act. Compl. ¶¶ 47-52. In responding to Defendant's Motion for Summary Judgment, Plaintiff identifies the "fraud" as Defendant's alleged violation of their Code of Conduct policy to investigate, claiming the breach of such policy was "by reason of an intentional design on its part to defraud Plaintiff." Pl.'s Mem. 28.

Because there was no contract between Plaintiff and RMC, summary judgment is appropriate as to Plaintiff's claim for breach of contract accompanied by a fraudulent act, as well. Further, Plaintiff has provided no competent evidence from which a jury could find Defendant acted fraudulently herein. Summary judgment is appropriate.

IV.     Conclusion

For the reasons set forth above, the undersigned recommends Defendant's Motion for Summary Judgment, ECF No. 36, be granted and this matter be ended.

IT IS SO RECOMMENDED.


February 10, 2016                                         Kaymani D. West
Florence, South Carolina                        United States Magistrate Judge


The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."