# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## ORANGEBURG DIVISION

| | | |
|---|---|---|
| Adeline Yon, | ) | Civil Action No. 5:14-cv-02098-JMC |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| The Regional Medical Center, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Adeline Yon ("Yon" or "Plaintiff") filed this action against her former employer, Defendant The Regional Medical Center ("TRMC" or "Defendant"), alleging that she was subjected to race discrimination, retaliation, and a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17. (ECF No. 1.) Yon also asserts state law claims for breach of contract and breach of contract accompanied by a fraudulent act. (Id.)

This matter is before the court on TRMC's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. (ECF No. 36.) In accordance with 28 U.S.C. § 636(b) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), the matter was referred to United States Magistrate Judge Kaymani D. West for pretrial handling. On February 10, 2016, the Magistrate Judge issued a Report and Recommendation in which she recommended that the court grant TRMC's Motion for Summary Judgment as to all of Yon's claims. (ECF No. 52.) Yon filed Objections to the Magistrate Judge's Report and Recommendation, which are presently before the court. (ECF No. 53.) For the reasons set forth below, the court **ACCEPTS** the Magistrate Judge's recommendation and **GRANTS** TRMC's Motion for Summary Judgment.

## I.    RELEVANT BACKGROUND TO PENDING MOTION

The facts as viewed in the light most favorable to Yon are discussed in the Report and Recommendation.  (ECF No. 52.)  The court concludes, upon its own careful review of the record, that the Magistrate Judge's factual summation is comprehensive and accurate and incorporates it by reference.  The court will only reference herein facts pertinent to the analysis of Yon's claims.

TRMC is a full service hospital in Orangeburg, South Carolina.  (ECF No. 36-2 at 1 ¶ 2.) Home Care ("HC") is one of the services TRMC provides.  (Id.)  HC provides in-home healthcare services for certain patients for the purpose of increasing the convenience and reducing "the cost of health care by delivering certain types of health care in the patient's home." (Id.)  HC is located near TRMC in a small retail office complex.  (Id.)

HC's primary workforce is made up of "'clinical' staff, which includes registered nurses, therapists, and a social worker."  (Id. at ¶ 4.)  Clinical staff members go into the field to treat patients in their homes.  (Id.)  Clinical staff members "perform a wide variety of services, including giving injections and other medications, administering blood pressure and other tests, treating wounds, and providing other medical, therapeutic, and social work services which may be needed by patients recovering from illness or injury."  (Id.)  The clinical care staff is supervised by a patient care coordinator, who is responsible for scheduling appointments and making sure treatment plans are being adequately staffed and followed.  (Id. at ¶ 3.)  Wendy Dantzler ("Dantzler") was the patient care coordinator from 2006 until July 2012.  (Id.)  Jill Hopkins began working as the patient care coordinator on October 1, 2012.  (Id.)

Yon began her employment with HC on May 3, 1999 as a salaried social worker.  (ECF No. 38-8 at 37:1–6 & 113:13–15.)  As a social worker, Yon's job responsibilities included, but

were not limited to, providing "Home Health/Hospice social work services to include family assessments and psychosocial interventions to assist with development of a multidisciplinary care plan . . . [and providing] support for patients and families through coordination of community resources."  (ECF No. 36-4 at 5.)

In November 2012, David Hill ("Hill") began work as the director of HC at TRMC. (ECF No. 36-2 at 1 ¶ 1.)  Hill reports to the vice president of patient services for TRMC, Julia Yawn ("Yawn").  (Id. at ¶ 3.)  In December 2012, Yawn and the chief financial officer of TRMC, Cheryl Mason, asked Hill to look for ways to reduce expenses.  (Id. at 3 ¶ 9.)  In considering how to reduce expenses, Hill focused on staff mileage reimbursement because in a former position he had managed to reduce expenses through auditing the mileage of clinical staff by comparing the reported mileage to the mileage total as calculated by MapQuest.[1]  (Id.)

In mid-January 2013, Hill began the process of checking employee mileage using MapQuest as a tool to gauge the accuracy of the mileage reported.  An administrative assistant, Eryn Radewitz, assisted Hill with this project and Radewitz was tasked with selecting one clinical staff member from each discipline at random for the initial review.  (Id. at 4 ¶ 10.)  Hill personally reviewed all of Radewitz's work, including routes and calculations.  (Id.)  According to Hill, "[t]he results of the review revealed a pattern of falsification by Yon."  (Id. at ¶ 11.)  More specifically, Yon's mileage requests were consistently over the MapQuest figures by significant amounts.[2]  (Id. at ¶¶ 11–12.)

On or about January 24, 2013, Hill conducted a meeting with the HC staff.  (Id. at 3 ¶ 8.)  During the meeting, Hill discussed a $400,000.00 "write-off" from the HC budget.  (Id.)  He

---

[1] MapQuest is a map publisher and a free online Web mapping service owned by AOL. Mapquest, http://wiki.gis.com/wiki/index.php/MapQuest (last visited Mar. 25, 2016).
[2] As Hill explained, the mileage "did not always match up perfectly."  (ECF No. 36-2 at 4 ¶ 10.) Minor variations were not a problem.  (Id.)

explained that the amount was written off by the hospital "because it represented uncollected bad debts or charges disallowed by providers." (Id.) "These charges had been accumulating for several years and the hospital felt that they needed to be written off." (Id.)

On January 29, 2013, Hill asked Yon about her mileage discrepancies. (Id. at 5 ¶ 13.) Yon refused to specifically discuss the mileage, but generally observed that she was a social worker and had to drive long distances. (Id.) Thereafter, Hill met with the director of staffing and retention, Kim Westbury ("Westbury"), and recommended terminating Yon's employment for falsifying mileage "unless she was able to explain the discrepancies." (Id. at ¶ 14.)

On the afternoon of January 29, 2013, Hill and Westbury met with Yon. (Id. at ¶ 15.) Hill explained to Yon the differences between her reported mileage and the mileage as calculated by MapQuest. (Id.) Hill showed Yon that her mileage calculations "were consistently higher for every entry and that the difference was significant." (ECF No. 36-5 at 2 ¶ 6.) Without addressing the substance of the allegations, Yon said that she was being singled out. (Id. at ¶ 7.) Hill and Westbury responded that "the mileage of other employees had been audited also" and "other employees had been terminated in the past for misrepresenting Hospital documents." (Id.) Eventually, Yon proceeded to depart the meeting by standing up, holding her hands over her head, saying "Thank the Lord, I am free," and hugging Hill and Westbury. (Id. at 15–16; ECF No. 38-8 at 77:24–78:10.) On January 29, 2013, Yon was terminated "due to falsifying mileage reports." (ECF No. 38-30 at 2.)

On January 30, 2013, Yon filed a grievance (ECF No. 36-14) with TRMC pursuant to its grievance and administrative review procedures. (ECF No. 36-4 at 85–93.) In her grievance, Yon alleged the following particulars:

I was unfairly terminated by the interim director, David Hill without a valid reason. On January 29, 2013, I was contacted by phone and asked to meet with him and Kim Westbury at the Human Resource office. At this time, I was told by David that when he compared my mileage to the nurses I did not add up. Prior to this meeting, I have never been asked about my mileage and this has never been addressed as a problem in my fourteen years of dedicated services to TRMC.

I am the only social worker in the home care office and I cover a very broad and rural territory. I've never relied on Google maps or GPS systems in finding my patients. I have always relied upon the directions provided by staff and/or the patient and they are sometimes subject to corrections or changes. It would be unfair to say that my mileage doesn't add up to the nurses because we don't see the same patients in the same order and oftentimes not from the same starting point.

Further, I not only make home visits to patients homes I also coordinate community resources and that entails me going to various community based sites to obtain information and resources for patients that I serve largely because they are unable to do so on their own. I have a very high rate of success with the patients that I serve largely due to this fact. I don't simply make home visits for assessment purposes only, there is a great deal of follow up and case management that is a required component to medical social services and home health. We have to serve our home and the communities in which they live and that is the nature of my work especially within rural and impoverished towns within our service areas.

Additionally, I am concerned that this termination came as an immediate and improper personnel action since the issue was never addressed with me as a concern. However, during our January 24, 2013 staff meeting was the first time mileage was addressed to the team emphasizing that we need to watch our mileage, (see staff meeting attached). He never held a meeting with me on a one-on-one basis concerning my mileage. I do recall David coming to me and stated on the morning of January 29, 2013 in an unprofessional manner that he was talking about me in the meeting. Then, around 4:15 p.m. he had me to meet with him and Kim Westbury. I didn't have a clue I was being terminated. They also demanded that I turn in all items that belonged to TRMC. I couldn't because I didn't have everything with me at the time. They had security to call me and asked for the belongings. I spoke with a gentleman by the name of Ira with security and informed him that I would bring all the items the next day, and he agreed that this would be just fine. I was not asked about my mileage logs and there were never any visits identified at any point that were being questioned prior to this meeting. This was overwhelming and surprising to me in which the situation was handled. I didn't know what to do. I just hugged both of them and thanked God for releasing me from this unfair treatment.

(ECF No. 36-14 at 2–3.) Yon's grievance was first heard by Yawn. (ECF No. 36-2 at 5 ¶ 17.)

In investigating Yon's grievance, Yawn requested further audits of Yon's mileage. (Id.) Hill

discovered additional discrepancies.  (Id. at 6 ¶ 18.)  Yon met with Yawn regarding her grievance on February 7, 2013.  (ECF No. 38-8 at 81:14–82:16.)  Following her meeting with Yon, Yawn confirmed Yon's termination on February 12, 2013.

Yon then followed the next step of TRMC's grievance procedure and met with the chief executive officer of TRMC, Thomas Dandridge, on March 19, 2013.  (ECF No. 38-18 at 12:7–10.)  Dandridge upheld Yon's termination.  (Id. at 26:20–22.)

After Yon was terminated, TRMC replaced her position with Loretta Green a part-time social worker who was called in on an as-needed basis.  (ECF No. 36-1 at 14 (citing ECF No. 36-8 at 3:13–17).)  Loretta Green is an African-American female.  (Id.)  Green held the position for several months.  (Id.)  Upon Green's departure, Cathy Thompson, who is also an African-American female, took over the vacant position.  (ECF No. 38-17 at 63:4–7.)

During her employment at HC, Yon alleged that she suffered through many instances of discriminatory and/or retaliatory conduct.  Yon summarized these incidents as follows:

> Ms. Yon's supervisor, from 2006 until 2012, was Wendy Dantzler (WF), the Personal Care Coordinator. On or about October 2012, Ms. Yon was informed, by former employee Charlotte Shuler, that Ms. Dantzler instructed Ms. Shuler to find issues with Ms. Yon's job performance, despite the fact that Ms. Yon performed her job duties (as shown in her 2011 job evaluation) without incident.  (Ex. 2: Plaintiff's Complaint) (Ex. 3: Plaintiff's 2011 Job Evaluation).

(ECF No. 38 at 2–3.)  . . .

> Ms. Dantzler continued to promote a racially hostile work environment when she gave Ms. Yon's office space to Tracy Stillinger (WF) and placed Ms. Yon in a small workspace among the other nurses.  Ms. Dantzler's reasoning for removing Ms. Yon from her office was that, "she [Tracy Stillinger] worked in the office on the computer all day and had to have access to other documents while she was working.  Adeline did not need an office.  If she was doing her job properly, she was on the road most of the day."  (Ex. 6 Excerpt of Wendy Dantzler's Affidavit).  However, Ms. Dantzler, in her Affidavit, stated that Ms. Yon seldom talked to patients in her office, she does not state that Ms. Yon never talked to patients in her office.  Ms. Dantzler also admitted that Ms. Yon would use her office space for conferences.

(Id. at 5.) . . .

Ms. Yon's job description, from The Regional Medical Center, did not include express supervisory authority, however, she had implied supervisory authority. Further, Social Workers, with Home Care, are given the authority to supervise, as shown in the Medical Social Services document. Ms. Dantzler's actions toward Ms. Yon were crafted in order to take away the implied supervisory authority, of Ms. Yon, though Ms. Yon had continuously performed her job duties without incident.

(Id. at 9.) . . .

Ms. Yon was the only Social Worker employed at The Regional Medical Center, however this did not exclude the possibility that the Defendant could have referred patients to social workers outside of Home Care. The nurses, before Ms. Dantzler changed the protocol, directly referred patients to Ms. Yon. This was the normal protocol throughout Ms. Yon's employment until Ms. Dantzler decided (without good cause) to have the nurses refer the patients to her (Ms. Dantzler) instead of Ms. Yon.

(Id.) . . .

"Plaintiff, on or about June 2012, overheard her Caucasian counterpart, Donna McAlhany (McAlhany), who worked in Medicaid and Medicare Billing, tell another Caucasian counterpart, that she was going to, 'get rid of these black trouble makers in the office.' Plaintiff, to her disbelief, also hears McAlhany state to a Caucasian counterpart that, 'blacks get too many free things, such as cell phones and food stamps.'" (Ex. 2 Plaintiff's Complaint ¶ 12).

(Id. at 12.) . . .

Ms. Yon, and several of her colleagues, took their concerns, over the racially hostile work environment to the Chief Nursing Officer, Julia Yawn (WF).

(Id. at 13.) . . .

The meeting Ms. Yon, and the nurses, had with Ms. Yawn addressed the concerns of working in a Racially Hostile Environment at The Regional Medical Center, placing her (and The Regional Medical Center) on notice of the issues, alleged by Ms. Yon, of the racial hostility. In fact several of the nurses brought their concerns about the Racially Hostile Environment to Ms. Yon, hoping to ease the racial tension, however, Ms. Yon, herself, soon became the target of inappropriate behavior and comments.

(Id. at 14.) . . .

Despite Ms. Yon's attempt to resolve the issues, concerning a Racially Hostile Environment, at The Regional Medical Center, the issues at the hospital continued to get worse. Management began to target Ms. Yon because she spoke up for other people. (Ex. 13 McMillan Affidavit). Unfair treatment occurred when management

began to promote less qualified Caucasians over more qualified African Americans, and Caucasians were given a slap on the wrist for serious incidents while African Americans were terminated for less serious violations. (Ex. 14 Davis Affidavit). The treatment of African Americans at The Regional Medical Center was so intense that some of the African American employees resigned, because they were the victim of race discrimination. (Ex. 15 Peeples Affidavit).

(Id. at 14–15.) . . .

On January 24, 2013, a staff meeting was held concerning the hospital budget. During the staff meeting Ms. Yon brought up legitimate concerns, about four hundred thousand dollars ($400,000.00) being missing from the hospital budget to David Hill (WM), Interim Director. Ms. Yon's concerns were justified because, during the meeting, it appeared as though the hospital was still unsure about the money issues, and Ms. Yon, herself, suggested an audit.

(Id. at 16.) . . .

Approximately five (5) days after Ms. Yon questioned Mr. Hill about the missing monies she was terminated from her job.

(Id.)

On March 27, 2013, Yon alleges that she filed a Charge of Discrimination (the "Charge") with the United States Equal Employment Opportunity Commission ("EEOC"). (ECF No. 1 at 2 ¶ 7(a).) After receiving notice of the right to sue from the EEOC as to the Charge, Yon filed an action in this court on May 30, 2014, alleging claims for (1) Title VII race discrimination (Count 1), Title VII retaliation (Count 2), Title VII racially hostile work environment (Count 3), breach of contract (Count 4), and breach of contract accompanied by a fraudulent act (Count 5). (Id. at 4–7.) TRMC answered the Complaint on June 13, 2014, denying its allegations. (ECF No. 5.) On April 16, 2015, TRMC moved for summary judgment. (ECF No. 36.) Yon filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment on May 4, 2015, to which TRMC filed a Reply to Plaintiff's Memorandum in Opposition on May 22, 2015. (ECF Nos. 38, 42.)

The Magistrate Judge issued her Report and Recommendation on February 10, 2016, recommending that TRMC's Motion for Summary Judgment be granted as to all Yon's claims.

(ECF No. 52.)  On February 29, 2016, Yon filed Objections to the Report and Recommendation. (ECF No. 53.)  TRMC responded to Yon's Objections on March 16, 2016.  (ECF No. 55.)

## II.     JURISDICTION

This court has jurisdiction over Yon's Title VII claims via 28 U.S.C. § 1331, as the claims arise under a law of the United States, and also via 42 U.S.C. § 2000e–5(f)(3), which empowers district courts to hear claims "brought under" Title VII.  Additionally, the court has supplemental jurisdiction over Yon's state law claims for breach of contract and breach of contract accompanied by a fraudulent act pursuant to 28 U.S.C. § 1367(a), because these claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  Id.

## III.     LEGAL STANDARD

A.     The Magistrate Judge's Report and Recommendation

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight.  The responsibility to make a final determination remains with this court.  See Mathews v. Weber, 423 U.S. 261, 270–71 (1976).  The court reviews de novo only those portions of a magistrate judge's report and recommendation to which specific objections are filed, and reviews those portions which are not objected to – including those portions to which only "general and conclusory" objections have been made – for clear error.  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983); Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982).  The court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions.  See 28 U.S.C. § 636(b)(1).

B.    Summary Judgment Generally

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248–49 (1986).  A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. Newport News Holdings Corp. v. Virtual City Vision, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).  The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial.  Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Anderson, 477 U.S. at 249.  "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion."  Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

## IV.    ANALYSIS

A.    The Report and Recommendation

Upon her review, and after considering Yon's Title VII race discrimination claim under the McDonnell Douglas burden-shifting framework, the Magistrate Judge determined that a

prima facie case was lacking because (1) Yon's falsification of records prevented her from demonstrating that she was meeting TRMC's legitimate expectations and (2) Yon was replaced by another African-American woman and therefore cannot show that she was treated differently than others outside of her protected class.  (ECF No. 52 at 13–17.)  The Magistrate Judge also determined that TRMC's stated reason for terminating Yon – her falsification of mileage reimbursement records – was legitimate and non-discriminatory and she could not demonstrate that the reason was pretextual.  (Id. at 18–19.)

In her analysis of Yon's retaliation claim, the Magistrate Judge first specified that the only viable protected activity occurred in March and April 2012 when Yon complained about racial issues.  (Id. at 27–28.)  The Magistrate Judge next separated the employment action that qualified as adverse for purposes of a prima facie case (i.e., Yon's January 2013 termination) from the actions that she did not consider adverse: (1) the reduction in referrals from 15-to-20 visits per week to 4-to-5 visits per week,[3] (2) her relocation in 2012 from an office to a "small workspace among the other nurses,"[4] and (3) a change in her job description to remove

---

[3] The Magistrate Judge decided that the reduction in referrals was not an adverse action because Yon was a salaried employee and "a reasonable person would not consider Plaintiff's reduced case load with no change to her salary to be materially adverse."  (ECF No. 52 at 34.)  Additionally, the Magistrate Judge noted that TRMC stated a legitimate, non-retaliatory reason for the decrease in referrals since it was not responsible for the number of referrals to Yon, physicians making the referrals controlled that number.  (Id. at 35–36.)

[4] In assessing the adverse nature of a move from an office to a cubicle, the Magistrate Judge observed that "[a]sking an employee to perform their job in a different work station, without other changes, particularly when her new work station is in the same area as other members of the clinical staff, was not a materially adverse action."  (ECF No. 52 at 37–38 (citing Mack v. S. C. Dep't of Transp., C/A No. 3:12-2960-MGLKDW, 2015 WL 1297836, at *19 & n.22 (D.S.C. Jan. 28, 2015) report and recommendation adopted, No. 3:12-CV-2960-MGL, 2015 WL 1297876 (D.S.C. Mar. 23, 2015) (move to cubicle not "materially adverse" event to satisfy prima facie retaliation claim)).)

supervisory authority from her.[5]  (Id. at 29-40.)  As to the termination, the Magistrate Judge then concluded that there was no causal connection between the 2013 termination and the 2012 complaints based on a lack of temporal proximity and even if there was, TRMC had presented a legitimate, non-discriminatory reason for Yon's termination: "that she falsified mileage-reimbursement claims."  (Id. at 29–30.)

In addressing Yon's hostile work environment claim, the Magistrate Judge isolated the following statements by Yon as to her evidence demonstrating the second and third elements of a prima facie case:

1. "[D]ue to her race, the Plaintiff was forced out of her much needed office space, was stripped of her implied authority, and her patient referrals were cut down"; and

2. "the hostile environment created an abusive work environment for Plaintiff because she was: (1) forced to work in a space that failed to provide her adequate space to perform her job duties, (2) subjected to Ms. Dantzler's constant abusive attitudes when she (Ms. Dantzler) told Ms. Shuler to find issues with Plaintiff's job performance, (3) subjected to Ms. Dantzler's constant (and continuous) insults, (4) and Nurses were told (by Ms. Dantzler) to cut back on patient referrals."

(ECF No. 52 at 41–42 (referencing ECF No. 38 at 31).)  Finding these statements to be conclusory without evidentiary support, the Magistrate Judge recommended granting summary judgment on Yon's hostile work environment claim on the basis that her evidence did not demonstrate that any allegedly unwelcome conduct was based on Yon's race or that it was sufficiently severe or pervasive to alter Yon's conditions of employment to create an abusive work environment.  (Id. at 42.)

Finally, as to Yon's state law claims, the Magistrate Judge observed that both the breach of contract and breach of contract accompanied by fraudulent act claims are based on TRMC's

_____

[5] The Magistrate Judge concluded that the alleged job description revision to remove supervisory authority was not an adverse employment action because Yon admitted that none of TRMC's job descriptions for social worker included supervisory authority.  (ECF No. 52 at 39.)

alleged failure to follow the "Four Step Communication and Reporting Process" and "Non-Retaliation Policy" contained in its Code of Conduct. (Id. at 46–47.) Upon her review of these policies, the Magistrate Judge determined that neither included "language sufficiently 'mandatory' to create a potential contract of employment that could be considered breached if not precisely followed." (Id. at 49.) The Magistrate Judge then found that "[t]he portions of the Code of Conduct upon which Plaintiff relies do not alter her at-will employment relationship with Defendant; therefore, there is no contract of employment that could be breached." (Id. at 51.) Accordingly, the Magistrate Judge recommended granting summary judgment to TRMC on both of Yon's breach of contract claims. (Id. at 51–52.)

Based on the reasons set forth in her Report and Recommendation, the Magistrate Judge recommended granting TRMC's Motion for Summary Judgment in its entirety. (Id. at 52.)

B.     Yon's Objections to the Magistrate Judge's Recommendation

First, Yon objects to the finding in the Report and Recommendation that her evidence did not satisfy the McDonnell-Douglas framework for a prima facie case of Title VII race discrimination. (ECF No. 53 at 5.) Specifically, Yon asserts that (1) she "engaged in a protected activity, when she spoke out against the race discrimination occurring in the office and when she spoke out about the missing monies in a January 24, 2013 meeting[]"; (2) TRMC "took adverse action by wrongfully terminating her from her position as a Social Worker[]"; (3) there was a causal connection between her protected activity and her termination because she was terminated 5 days after voicing concerns over missing monies; (4) she was performing her job duties diligently and excellently based on feedback from both her patients and her colleagues[6]; and (5)

---

[6] As to the issue of her job performance, Yon also disagreed with the Magistrate Judge's conclusion that Yon's MapQuest evidence did not have any bearing on her overall job performance. (ECF No. 53 at 6.) Yon asserts that she "submitted into evidence MapQuest Copyright Information which clearly indicated that MapQuest should not be used for the purpose

she as a member of a protected class was treated differently because TRMC only wrongfully terminated protected class members.  (ECF No. 53 at 4–5.)  Yon asserts that the Magistrate Judge erred in finding that TRMC "met its burden of proving a legitimate non-discriminatory reason for terminating Plaintiff[]" while she failed to demonstrate pretext.  (Id. at 7.)  Yon argues that her claims should be presented to a jury based on the fact she as an African-American "was terminated from her position due to alleged miscalculated mileage, while her Caucasian counterparts remained employed with the Defendant, despite their [own] mileage miscalculation. (Id. at 7–8.)

Yon next objects to the finding in the Report and Recommendation that she was not forced to work in a racially hostile work environment.  Yon asserts that (1) the conduct in question was unwelcome "because she continuously reported her concerns to upper management[]"; (2) she was subjected to the conduct in question because of her race; and (3) the conduct was sufficiently severe as a result of her being (a) "forced to work in a space that failed to provide her adequate space to perform her job duties," (b) "subjected to . . . constant abusive attitudes . . . to find issues with Plaintiff's job performance, (c) "subjected to . . . constant (and continuous) insults," (4) and Nurses were told . . . to cut back on patient referrals."  (Id. at 8–9.) Yon argues that a jury should determine whether she was forced to work in a racially hostile work environment.  (Id. at 9.)

Yon also objects to the finding that her prima facie case of retaliation fails.  As with her discrimination claim, Yon asserts two instances of protected activity: first, when she spoke out against the race discrimination occurring in the office; and, second, when she spoke out about the missing monies in a January 24, 2013 meeting.  As to the latter, Yon asserts that she suffered an

---

of accuracy and further states the reason why the system is not accurate."  (Id. (referencing ECF No. 38-23).)

adverse employment action when TRMC terminated her employment and, as to the former, when TRMC cut down on her patient referrals, forced her out of her office into a small workspace that was not reasonable for her to conduct her job duties, and took away her implied authority. (Id. at 11.) To demonstrate the requisite causal connection, Yon asserts that her termination occurred 5 days after voicing concerns over missing monies and the other adverse actions occurred over a period of time because she "was constantly speaking up about her concerns of race discrimination to the Defendant, . . . ." (Id. at 11–12.) In consideration of the aforementioned, Yon argues that a jury could easily determine that TRMC retaliated against her "by slowly removing . . . [her] job responsibilities from her in an attempt to terminate her, . . . ." (Id. at 12.)

As to her state law claims, Yon disagrees with the Magistrate Judge and argues that her evidence establishes a breach of contract based on the fact that TRMC's Code of Conduct contains mandatory language that the company failed to follow. (Id. at 14–15.) Moreover, she argues that TRMC committed fraud when it stated in the Code of Conduct that it would investigate complaints of race discrimination, but failed to do so as it relates to Yon. (Id. at 15–16.) As a result, Yon asserts that "there was a breach of contract and it was with a fraudulent intent." (Id. at 16.)

C.     The Court's Review

In light of the foregoing authorities and the parties' respective positions, the court considers each of the claims relevant to TRMC's Motion for Summary Judgment in turn below.

*1. Race Discrimination*

In her Objections, Yon admits that she is seeking to establish race discrimination through circumstantial evidence. (ECF No. 53 at 4.) As a result, she argues that she has satisfied the McDonnell-Douglas framework for establishing a prima facie case of Title VII race

discrimination.  (Id.)

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . ."  42 U.S.C. § 2000e-2(a)(1).  Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class, or there is some other evidence giving rise to an inference of unlawful discrimination.  Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010); Cason v. S.C. State Ports Auth., C/A No. 2:11-2241-RMG-BM, 2014 WL 588031, at *4 (D.S.C. Jan. 7, 2014) (citations omitted).  "The employer may then rebut the prima facie case by showing that there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are pretextual."  Hammett v. S.C. Dep't of Health & Envtl. Control, C/A No. 3:10-932-MBS-SVH, 2013 WL 1316440, at *5 (D.S.C. Jan. 25, 2013) (citing Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005)).

Upon review, the court agrees with the Magistrate Judge that Yon cannot satisfy the second and fourth elements of a prima facie case of race discrimination.  First, even though Yon disputes that her job performance was unsatisfactory, the court observes that an employee's submission of a falsified mileage report for reimbursement is presumably the type of act that warrants a finding of unsatisfactory job performance.  Cf. S.C. Code Ann. §§ 40-63-110(B)(11) (2015) ("Misconduct, which constitutes grounds for revocation, suspension, or restriction of practice or limitation on, reprimand, or other discipline of a [social work] licensee is a

satisfactory showing to the board that: . . . (11) the licensee is guilty of the use of any intentionally false or fraudulent statement in any document connected with the practice of social work; . . . ."); Andree v. Siemens Energy & Automation, Inc., F. App'x 145, 151 (7th Cir. 2003) ("The fact that Andree was discharged for falsifying his call reports and not because of the unsatisfactory execution of his duties simply establishes that the filing of false and fraudulent reports in the business world is a very proper and accepted cause for termination, and obviously more serious than inadequate or poor job performance.").

Second, Yon failed to identify similarly situated employees outside the protected class that were not terminated for falsifying mileage. She only generally alleges that white employees remained employed even though they also had miscalculated mileage. (ECF No. 53 at 7–8.) Moreover, because her replacement was an African-American female, Yon cannot show that she was discharged under circumstances giving rise to an inference of discrimination. E.g., Spiegler v. Isr. Disc. Bank of N.Y., No. 01 Civ. 6364(WK), 2003 WL 21488040, at *11 (S.D.N.Y. June 25, 2003) ("Where no evidence giving rise to an inference of discrimination has been presented, the fact that a plaintiff is replaced with an individual within his protected class undermines his attempt to establish a prima facie case of discrimination.").

However, even assuming Yon could establish a prima facie case of race discrimination regarding her termination, in order for Yon to survive TRMC's Motion for Summary Judgment, she would have to come forward with sufficient evidence to demonstrate that the legitimate reason offered by TRMC was not its true reason, but was a pretext for discrimination. Specifically, TRMC has stated that Yon was terminated for "falsifying mileage reports." (ECF No. 38-30 at 2.)

In her response to TRMC's proffered reason for her termination, Yon asserts the

following:

> The Defendant appears to base the fact that Plaintiff was not performing her job duties on the fact that she allegedly falsified documentation concerning her mileage, a statement that Plaintiff clearly denies and states is pretextual. As a result, Plaintiff has provided factual, not opinionated, evidence that shows that the Defendant based its argument off of unreliable information. For example, Plaintiff submitted into evidence MapQuest Copyright Information which clearly indicated that MapQuest should not be used for the purpose of accuracy and further states the reason why the system is not accurate. (Entry # 38 Ex. 23). Further, it is not of the Plaintiff's opinion that the Defendant failed to provide a policy on how to calculate mileage (in its handbook or in any other written or oral statement), as it is factually proven that the Defendant failed to indicate to its employees the proper procedure to calculating the mileage when traveling to visit patients. There is also further testimony submitted by Plaintiff through fellow colleagues Barbara Grant and Arnita Frazier by depositions (Entry #38 Ex. 4, 7) concerning the fact that there was no set policy given by the Defendant on how to properly calculate mileage. Specifically, none of the Defendant's agents testified to, or stated, that there was a policy enforced by the Defendant on how to calculate the mileage.

(ECF No. 53 at 6.)

"The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Anderson v. Ziehm Imaging, Inc., C/A No. 7:09-02574-JMC, 2011 WL 1374794, at *5 (D.S.C. Apr. 12, 2011) (citing Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000)). "The ultimate question is whether the employer intentionally discriminated and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that [plaintiff's] proffered reason . . . is correct . . . [i]t is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000)) (internal citations omitted). Rather, Yon must demonstrate that a reasonable jury could "believe [her] explanation of intentional race discrimination." Id.

Upon the court's review, there is insufficient evidence to support a finding that TRMC's decision to terminate Yon on January 29, 2013, was motivated by her race. Jiminez v. Mary

Washington Coll., 57 F.3d 369, 378 (4th Cir. 1995) ("[T]o establish that a proffered reason for the challenged action was pretext for discrimination, the plaintiff must prove 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct.") (citation omitted).  The court finds that Yon's evidence as highlighted in her Objections to the Magistrate Judge's Report and Recommendation and her Memorandum in Opposition to Defendant's Motion for Summary Judgment does not rise to the level necessary to establish that her race actually played a role in the decision-making process and had a determinative influence on the outcome.  In employment discrimination actions, it is not the role of the court to "sit as a super-personnel department weighing the prudence of employment decisions."  Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (internal quotation marks omitted).  Based on the foregoing, the Magistrate Judge correctly found that Yon has not produced sufficient evidence to meet her burden of proving that TRMC's asserted reason for terminating her on January 29, 2013, was a pretext for race discrimination.  Accordingly, Yon's Title VII race discrimination claim fails as a matter of law and TRMC is entitled to summary judgment.

2.  *Retaliation in Violation of Title VII*

Title VII protects individuals from retaliation.  42 U.S.C. § 2000e-3(a).[7]  As a result of her speaking out against race discrimination occurring in the office and missing monies in a January 24, 2013 meeting,[8] Yon asserts that she was retaliated against when she was terminated,

---

[7] "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

[8] The Magistrate Judge concluded that the only "protected activities" occurred in March and April 2012.  (ECF No. 52 at 28.)  Moreover, the Magistrate Judge observed that Yon's complaints at the January 24, 2013 staff meeting were not protected because they were about

given a lower number of patient referrals, moved from her office to a smaller workspace, and stripped of her implied supervisory authority.  (ECF Nos. 38 at 23–24 & 53 at 10–11.)  Yon further asserts that "the audit was a pretext for . . . [her] termination" because TRMC "made it their goal to try and terminate . . . [Yon] from her job because she continued to speak up against race discrimination."  (ECF No. 53 at 13.)

In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under the aforementioned burden-shifting method.  Under the burden-shifting method, to demonstrate a prima facie case of retaliation under Title VII, a plaintiff must show (1) that he engaged in protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action.  Rhoads v. F.D.I.C., 257 F.3d 373, 392 (4th Cir. 2001); Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 242 (4th Cir. 1997).  Once the plaintiff establishes a prima facie case of retaliation, the defendant can rebut the presumption of retaliation by articulating a non-discriminatory reason for its action.  Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 271 (4th Cir. 2001) (citation omitted).  At that point, the plaintiff has the opportunity to prove that the employer's legitimate, non-discriminatory reason is pretextual.  Id.

Upon review, the court observes that TRMC offered the following non-discriminatory reasons for each of the alleged adverse employment actions alleged by Yon:

1. Termination – Yon was terminated for falsifying mileage reports.  (ECF No. 38-30 at 2.)

---

missing money and "questions and complaints about corporate fiscal issues do not relate to potential civil rights violations, . . . ."  (Id.)

2. Lower Patient Referral Numbers – Yon was the only social worker. (ECF No. 38-6 at 2 ¶ 16.) "The Patient Care Coordinator did not generate social work referrals." (ECF No. 36-1 at 6.) "Social work referrals were generated by the Admissions Nurse with approval from a physician." (Id.) "If a doctor or the Admissions Nurse gave . . . [Dantzler] a referral, there was no way . . . [she] could have kept . . . [Yon] from seeing the patient." (ECF No. 38-6 at 2 ¶ 16.)

3. Relocation to Smaller Workspace – "Yon was asked to move from the small office and into the office space with the other clinical staff, because her office was needed for a Data Entry Clerk." (ECF No. 36-1 at 4.) "Yon's new workspace included a personal work station, telephone, and a computer connection." (Id.) "Her work station was identical to the work stations occupied by every other clinical staff member of HC." (Id.) "The Data Entry Clerk, Tracy Stillinger, had no other place to work and needed the office because she worked on a full-size desktop computer." (ECF No. 36-1 at 4 (citing ECF No. 38-6 at 2 ¶ 18).) "She also needed room to store other documents while she was processing bills." (ECF No. 36-1 at 4 (citing ECF No. 38-6 at 2 ¶ 18).) "Unlike Plaintiff, Stillinger worked in the office all day long while Yon was only at the office in the morning and late afternoon." (Id.) "There were no other offices available in which to locate Stillinger." (ECF No. 36-1 at 4 (citing ECF No. 38-6 at 2 ¶ 18).)

4. Loss of Implied Supervisory Authority – "RMC conducted a diligent search of its policies, records, and job descriptions and has not found any job description for a Social Worker which included supervisory duties." (Id. (citing ECF No. 36-4 at 1 ¶ 4).) Moreover, Yon "never had any supervisory authority . . . because she was the only social worker and there was no one for her to supervise." (ECF No. 38-6 at 2 ¶ 18.)

Therefore, after consideration of the foregoing, the court finds that Yon's Title VII retaliation claim fails for the same reason her Title VII race discrimination claim failed: the absence of sufficient evidence indicating that TRMC's stated non-retaliatory reason for the adverse employment actions that Yon suffered were pretextual. Therefore, the court overrules Yon's Objection and finds that TRMC is entitled to summary judgment on her Title VII retaliation claim.

*3. Hostile Work Environment*

In the following summary, Yon provides the basis for her Objection to the Magistrate Judge's recommendation regarding the claim for hostile work environment:

First, Plaintiff clearly states that the racially hostile environment that she was subjected to was unwelcome because she continuously reported her concerns to upper management. Second, the Plaintiff was subjected to this environment because of her race. As stated above, due to her race, the Plaintiff was forced out of her much needed office space, was stripped of her implied authority, and her patient referrals were cut down. The above facts, and witness testimony, also show that the Defendant's Agents had a propensity for favoring Caucasian employees over African Americans. Third, the hostile environment created an abusive work environment for Plaintiff because she was: (1) forced to work in a space that failed to provide her adequate space to perform her job duties, (2) subjected to Ms. Dantzler's constant abusive attitudes when she (Ms. Dantzler) told Ms. Shuler to find issues with Plaintiff's job performance, (3) subjected to Ms. Dantzler's constant (and continuous) insults, (4) and Nurses were told (by Ms. Dantzler) to cut back on patient referrals. Fourth, Plaintiff voiced her concerns about the racially hostile work environment with the Defendant, as stated in the facts, frequently. Plaintiff reached out to Ms. Yawn by meeting with her face to face, via e-mail, and by phone, however, this was to no avail as Ms. Yawn (Defendant's Agent) failed to do an investigation into Plaintiff's allegations of being subjected to a racially hostile work environment.

(ECF No. 53 at 8–9.) In addition to her own assertions, Yon submitted affidavits from former co-workers (Latonya Peeples,[9] Adrienne McMillan,[10] and Shirley Davis[11]) who confirmed an environment at TRMC that did not provide the most rewarding experience for African-Americans. Based on the foregoing, Yon argues that a jury should be allowed to decide whether she was "forced to work in a racially hostile work environment." (Id. at 9.)

"To demonstrate . . . a racially hostile work environment, a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's . . . [race]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive

---

[9] Yon "has been the target of racial and social discrimination at TRMC for years." (ECF No. 38-15 at 2.) "I have personally witnessed the retaliation." (Id.) Mrs. Yon has been a target because she stands up for the voiceless employees in the office." (Id.)

[10] Yon "had started speaking up for coworkers, when they found it hard to speak up for themselves." (ECF No. 38-13 at 2.) This of course, did not please the management in the office, and they seemed to create more rules, and hoops she needed to jump through, . . . ." (Id.)

[11] "I believe Mrs. Adeline Yon and others with allegations against the Regional Medical Center." (ECF No. 38-14 at 2.)

work environment; and (4) which is imputable to the employer.'"[12] <u>Okoli v. City of Balt.</u>, 648 F.3d 216, 220 (4th Cir. 2011) (quoting <u>Mosby-Grant v. City of Hagerstown</u>, 630 F.3d 326, 334 (4th Cir. 2010).)   A work environment is hostile when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (internal citations omitted).   The Magistrate Judge determined that Yon failed to present evidence sufficient to establish the second and third elements of the prima facie case of hostile work environment.

After careful review of the record, the court finds that even assuming the other elements of the prima facie case are satisfied, Yon has failed to set forth specific evidence that she was subjected to unwelcome harassment as a result of her race that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere.   As thoroughly summarized by the Magistrate Judge (ECF No. 52 at 42–46), the conclusory statements of Yon and her former co-workers about TRMC's general treatment of them personally and African-Americans in general, because they lack specific evidentiary support, cannot support an actionable claim for race-based hostile work environment.   <u>Causey v. Balog</u>, 162 F.3d 795, 801–02 (4th Cir. 1998).   Therefore, after reviewing the totality of the harassing conduct alleged by Yon, the court agrees with the Magistrate Judge that TRMC is entitled to summary judgment on Yon's hostile work environment claim on the basis of race.

### 4.  *Breach of Contract*

With respect to employment, there is a presumption in South Carolina that employees are

---

[12] A plaintiff can establish a hostile work environment claim by direct evidence, or, as is more common, by relying on the indirect, burden-shifting method set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  <u>Kasznski v. Thompson</u>, 83 F. App'x 526, 527–28 (4th Cir. 2003).

at-will.  Prescott v. Farmer's Tel. Co–Op., Inc., 516 S.E.2d 923, 927 n.8 (S.C. 1999) (In South Carolina, "there is a presumption of at-will employment").  In order to prevail on a breach of contract claim under South Carolina law, a plaintiff bears the burden of establishing the existence and terms of the contract, defendant's breach of one or more of the contractual terms, and damages resulting from the breach.  Taylor v. Cummins Atl., Inc., 852 F. Supp. 1279, 1286 (D.S.C. 1994) (citing Fuller v. E. Fire & Cas. Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962)).  In an action asserting breach of contract based on a handbook or other statement of company policy, once an employer voluntarily publishes the handbook or policy to its employees, the employer may be held liable for breach of contract if the employee can establish that the handbook, policy, or other similar material applies to the employee, sets out procedures binding on the employer, and does not contain a conspicuous and appropriate disclaimer.  Grant v. Mount Vernon Mills, Inc., 634 S.E.2d 15, 20 (S.C. Ct. App. 2006).  Therefore, for Yon to survive TRMC's Motion for Summary Judgment, the evidence before the court must be sufficient to create a genuine issue of fact that a contract for employment was created in this case.

As the basis for her breach of contract claim, Yon asserts that TRMC's Code of Conduct contains 2 policies – the Four Step Communication and Reporting Process and the Non-Retaliation Policy – that both contain mandatory language which TRMC breached when it "wrongfully terminated Plaintiff approximately five days after the Plaintiff voiced her concerns about missing money, and after they lowered Plaintiff's patients referrals, removed Plaintiff from her office, and by taking away Plaintiff's implied authority after she continuously voiced her concerns over working in a racially hostile work environment."  (ECF No. 38 at 27–28.)  The Four Step Communication and Reporting Process provides:

> If you have a question or concern about an activity being unethical, illegal or wrong, use the following process to answer questions and reporting concerns. Throughout this process your identity will be kept confidential as much as possible.
>
> 1. Talk to your supervisor or department chair for medical staff. He or she is most familiar with the laws, regulations and policies that relate to your work.
>
> 2. If you are uncomfortable contacting your supervisor or if you do not receive an adequate response, talk to the next person in the chain of command. You may also choose to speak with the director of Human Resources.
>
> 3. If you have followed either #1 or #2 and still have questions, contact our Corporate Integrity Officer at . . . .
>
> 4. If for any reason you feel you cannot follow the above steps, or do not want to give your name, call the Regional Medical Center Compliance Hotline at . . . . The Regional Medical Center Corporate Integrity Officer will review and address all reports to the Hotline.

(ECF No. 38-29 at 9.) The Non-Retaliation Policy provides:

> No disciplinary action or retaliation is taken against any individual who reports a perceived issue, problem, concern or violation to management, Human Resources, Corporate Integrity or the Compliance Hotline "in good faith." The "in good faith" requirement means an employee actually believes or perceives the information reported to be true.

(Id. at 10.)

Upon review of the Four Step Communication and Reporting Process the Non-Retaliation Policy, the court does not find any language therein that is sufficient to establish a genuine issue of fact that Yon had a "contract" of employment by virtue of these policies. For language in these policies to create binding contractual obligations, the provisions cited by Yon must contain sufficiently mandatory terms that give rise to a reasonable expectation on their part of continued employment. Small v. Springs Indus., Inc., 357 S.E.2d 452, 455 (S.C. 1987). In this regard, the policies cited by Yon do not in any way limit TRMC's right to terminate Yon's employment and, therefore, her at-will status has not been altered by the policies. Wadford v. Hartford Fire Ins. Co., C/A No. 3:87–2872-15, 1988 WL 492127, at *5 (D.S.C. 1988) ("A review of the relevant authorities . . . reveals that a policy or representation must limit the

duration of employment or the employer's right to terminate employment in order to alter at-will status.  Other terms and conditions of employment, including pay, benefits, job duties, or location of performance may be changed prospectively by either party without violating an employment contract with an indefinite term.").  Based on the foregoing, the court finds that Yon's Objection to the Magistrate Judge's recommendation is without merit and TRMC is entitled to summary judgment on Yon's claim for breach of contract.

     *5. Breach of Contract Accompanied by Fraudulent Act*

As to her claim for breach of contract accompanied by a fraudulent act, Yon asserts that in addition to her demonstration of a breached contract, she can show the commission of a fraudulent act accompanying the breach when TRMC "stated that they would investigate Plaintiff's allegations into race discrimination, yet there is no evidence that any investigation was conducted, thus violating their own Code of Conduct policy."  (ECF No. 38 at 28.)

Upon review, the court finds that the breach of contract accompanied by a fraudulent act claim fails because, as discussed above, Yon can neither overcome the presumption of at-will employment nor provide sufficient factual support to sustain a breach of contract claim.  Accordingly, the court overrules Yon's Objection to the Magistrate Judge's recommendation to grant TRMC summary judgment on the claim for breach of contract accompanied by a fraudulent act.

## V.     CONCLUSION

Upon careful consideration of the entire record, the court hereby **GRANTS** the Motion for Summary Judgment of Defendant The Regional Medical Center.  (ECF No. 36.)  The court **ACCEPTS** the Magistrate Judge's Report and Recommendation (ECF No. 52) and incorporates it herein by reference.

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

March 28, 2016
Columbia, South Carolina